867 A.2d 314

**STATE of Maryland**

v.

**Michael Conway SNOWDEN.**

**No. 42, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 7, 2005.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for petitioner.

Jennifer P. Lyman, Public Defender, Community Legal Clinics, George Washington University Law School of Washington, D.C., on brief, for respondent.

Tom Harbison, Sr. Atty., Victor Vieth, Mary Leary, amicus curiae for American Prosecutors Research Institute.

Lynn McClain, Baltimore, Michael J. Schreyer, Waldorf, Leigh Goodmark, Baltimore, Russell P. Butler, Upper Marlboro, Lisae C. Jordan, Silver Spring, amicus curiae for Maryland Crime Victims' Resource Center, Inc., University of Baltimore Family Law Clinic, Advocates for Children and Youth, Inc., and Maryland Coalition Against Sexual Assault.

Blair G. Brown, Elizabeth G. Taylor, Eric R. Delinsky, Zuckerman Spaeder, LLP, Washington, D.C., amicus curiae for National Assn. of Criminal Defense Lawyers and Maryland Criminal Defense Attys. Assn.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

HARRELL, J.

In this case we consider whether statements made by child abuse victims to a social worker, though hearsay, may continue to be admitted at a criminal trial through the social worker under Maryland's "tender years" statute, Md.Code (2001), § 11–304 of the Criminal Procedure Article, in light of the U.S. Supreme Court's ruling in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We shall hold that they may not.

## I.

The events giving rise to this case began in late January 2002, when then 10 year old Tiffany P., 10 year old Megan H., and 8 year old Raven H. approached Tiffany's mother, Vicki P., and told her that the man the girls knew as "Uncle Mike," Michael Conway Snowden, had touched them in an inappropriate manner.[1] Vicki P., who provided after-school care in her

---

1. The three girls initially learned of each other's experiences with Snowden when, in the course of playing together, Raven told Tiffany that Snowden had touched her on her vaginal area. Tiffany told Raven

home for the three girls, recently had allowed Snowden and his girlfriend to live in her residence because they were experiencing financial difficulties.

Vicki P. testified that, upon hearing the allegations from the children, she called Snowden home from his work and, with Tiffany present, confronted him. Snowden denied the allegations. Soon after, however, Vicki P. called the police. A joint investigation by the Montgomery County Police Department and the Child Protective Services for Montgomery County resulted.[2] On 4 February 2002, at the request of Detective Jackie Davey, the children were interviewed by Amira Abdul–Wakeel, a sexual abuse investigator for the Montgomery County Department of Health and Human Services.[3]

With Detective Davey present, Wakeel separately interviewed Vicki P., Tiffany, Megan, and Raven at the Juvenile

---

that Snowden had done the same to her, and the two girls then spoke with Megan, who also shared that Snowden had touched her inappropriately. The three girls then informed Tiffany's older sister, LaShawna, of the inappropriate touchings. LaShawna told the girls that they "definitely needed to tell their mother."

2. The collaboration between the police and Child Protective Services was occasioned by the familial relations between the alleged abuser, Snowden, and one of the victims. Snowden was Vicki P.'s uncle, and thus Tiffany's great uncle.

3. Wakeel's job title was Social Worker II. She described herself during her trial testimony as a "sexual abuse investigator." At the time of trial, Wakeel had been in her position with Montgomery County for approximately one year, and had testified in Montgomery County courts on four separate occasions in ex parte proceedings involving children. She testified here that her job responsibilities were to "assess [the] safety of children in sexual abuse cases and neglect cases." She explained that this involved a structured interview procedure, and described her interview style as "pleasant," yet "businesslike." Prior to her employment with Montgomery County, Wakeel was employed as a child advocacy social worker in Philadelphia, where she acted in the role of court representative, testifying in uncontested child welfare petitions. Wakeel also had prior experience as a social worker for the Philadelphia Department of Human Services, where she handled 40 to 60 child dependency cases per month, testifying in those cases three or four times per week. Wakeel stated that she also had extensive training in sexual abuse investigation, forensic interviewing, and sexual abuse interviewing.

Assessment Center in Rockville. At the beginning of each interview, Wakeel asked each girl whether she knew why she was being interviewed. Each responded that she was aware that she was being interviewed as a result of her accusations against Snowden.[4]

During her interview, Tiffany stated that, on one occasion, Snowden entered her bedroom purportedly to return a telephone. Snowden began to touch her on her breasts and on her vagina, and then touched her buttocks as she left the room.

Megan told Wakeel that Snowden approached her as she was coming down the stairs one day in the home. In the course of attempting to pick her up, Snowden intentionally touched her chest and vaginal area. Megan told Wakeel that she was not particularly close to Snowden, and only knew him because he was staying at her babysitter's house. Megan also

---

4. Wakeel testified during the State's direct examination as to the girls' responses during the interviews:

Q. How did you begin talking to [Tiffany] after you went through your preliminaries?
A. I asked her if she knew why she was here.
Q. What did she say?
A. She said, yes.
Q. Okay, did she say anything else?
A. She said, yes, because of Uncle Mike.
Q. . . . What did she say about Uncle Mike?
A. She stated that Uncle Mike had been touching her inappropriately.
Q. Did she actually use the word "inappropriate"? What did Tiffany say?
A. Initially, she said that he was touching her.
* * *
Q. What did you do after you reviewed the gender-specific diagrams?
A. I asked [Megan], did she know why she was here.
Q. And what did she say?
A. "Yeah, because a man touched me inappropriately."
* * *
Q. What did you do then after you asked [Raven] some preliminary questions?
A. I asked her if she knew why she was here.
Q. And what did she say?
A. "Because Mike [Snowden] touched us."

stated that Snowden would "hit her a lot . . . on the face and on the arms."

Raven told Wakeel that, one day while she was watching television in Vicki P.'s house, Snowden came into the room and sat down on the bed with her. Snowden pulled her arm so that she became seated between Snowden's legs. Snowden then "put his arms around her and placed his hands in her vaginal area and rubbed his private area against her buttocks."

On 14 February 2002, Snowden was arrested on a warrant issued based on information obtained during Wakeel's interviews with the children. While in police custody, Snowden denied the allegations of child abuse. At the suggestion of the police, however, he wrote a letter of apology to the girls, expressing his desire for the girls' forgiveness for what he characterized as accidental touchings.

On 16 May 2002, Snowden was indicted [5] on one count of child abuse [6] and six counts of third degree sexual offense.[7]

---

**5.** The charges consisted of one count of child abuse against Tiffany P. in violation of Md.Code (2002), § 3–601 of the Criminal Law Article (formerly Md.Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Art. 27, § 35C), three counts of third degree sexual offense against Tiffany P. in violation of Md.Code (2002), § 3–307 of the Criminal Law Article (formerly Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 464B), one count of third degree sexual offense against Raven H., and two counts of third degree sexual offense against Megan H.

**6.** Snowden was charged under Md.Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Art. 27, § 35C (recodified at Md.Code (2002), § 3–601 of the Criminal Law Article) which provides as follows:

§ 35C. Causing abuse to child.

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Abuse" means:

(i) The sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or threatened thereby; or

(ii) Sexual abuse of a child, whether physical injuries are sustained or not.

(3) "Child" means any individual under the age of 18 years.

(4) "Family member" means a relative of a child by blood, adoption, or marriage.

(5) "Household member" means a person who lives with or is a regular presence in a home of a child at the time of the alleged abuse.

(6)(i) "Sexual abuse" means any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member.

(ii) "Sexual abuse" includes, but is not limited to:

1. Incest, rape, or sexual offense in any degree;

2. Sodomy; and

3. Unnatural or perverted sexual practices.

(b) *Violation constitutes felony; penalty; sentencing.*—(1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child or a household or family member who causes abuse to the child is guilty of a felony and on conviction is subject to imprisonment in the penitentiary for not more than 15 years.

(2) If the violation results in the death of the victim, the person is guilty of a felony and upon conviction is subject to imprisonment for not more than 30 years.

(3) The sentence imposed under this section may be imposed separate from and consecutive to or concurrent with a sentence for any offense based upon the act or acts establishing the abuse.

7. Snowden was charged under Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 464B (recodified at Md.Code (2002), § 3–307 of the Criminal Law Article), which provides as follows:

§ 464B. Third degree sexual offense.

(a) *Elements of offense.*—A person is guilty of a sexual offense in the third degree if the person engages in:

(1) Sexual contact with another person against the will and without the consent of the other person, and:

(i) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

(ii) Inflicts suffocation, strangulation, disfigurement or serious physical injury upon the other person or upon anyone else in the course of committing that offense; or

(iii) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

(iv) Commits the offense aided and abetted by one or more other persons; or

(2) Sexual contact with another person who is mentally defective, mentally incapacitated, or physically helpless, and the person knows or should reasonably know the other person is mentally defective, mentally incapacitated, or physically helpless; or

(3) Sexual contact with another person who is under 14 years of age and the person performing the sexual contact is four or more years older than the victim; or

Immediately prior to trial, the State filed a motion to invoke Md.Code (2001), § 11–304 of the Criminal Procedure Article, otherwise known as Maryland's "tender years" statute. The statutory scheme of § 11–304, if properly invoked and applicable, allows the prosecution to substitute a health or social work professional's testimony for that of the children if, among other things, the trial court interviews the children in a closed hearing and makes a finding on the record that the victims' statements possessed "specific guarantees of trustworthiness." The trial judge here examined the children, and ruled that Wakeel's testimony of their accounts as told to her satisfied the requirements of the statute. Snowden objected to the admittance of Wakeel's testimony, arguing that its allowance violated his Sixth Amendment right to confrontation guaranteed by the federal Constitution and the Maryland Declaration of Rights. The trial judge overruled Snowden's objection. The children, who the State represented were present, were allowed to depart and did not testify.

Based largely on Wakeel's testimony, Snowden was found guilty by the trial judge on all counts.[8] Snowden timely

---

(4) A sexual act with another person who is 14 or 15 years of age and the person performing the sexual act is at least 21 years of age; or (5) Vaginal intercourse with another person who is 14 or 15 years of age and the person performing the act is at least 21 years of age. (b) *Penalty.*—Any person violating the provisions of this section is guilty of a felony and upon conviction is subject to imprisonment for a period of not more than 10 years.

8. The trial court imposed the following sentences: Count I (child abuse)–10 years imprisonment, five years suspended with credit for time served; Count II (third degree sexual offense)-three years to run concurrent with Count I; Count III (same)-three years to run concurrent with Count I and II; Count IV (same)-three years to run concurrent with Counts I through III; Count V (same)-five years, all but 18 months suspended, consecutive to Counts I through IV; Count VI (same)-five years, all but 18 months suspended, consecutive to Counts I through V; Count VII (same)-5 years, all but 18 months suspended, consecutive to Counts I through V, concurrent with Count VI. The trial judge also sentenced Snowden, upon release, to 5 years of supervised probation, subject to special conditions including requiring Snowden to register as a sex offender, and ordering him to have no contact with the families of the three children and no unsupervised contact with children under the age of 16.

appealed to the Court of Special Appeals. Oral argument in the intermediate appellate court was held on 5 February 2004. Approximately one month later, on 8 March 2004, the U.S. Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held generally that testimonial statements may not be admitted in evidence through non-declarant witnesses unless the declarant is unavailable and there is a prior opportunity for cross-examination. On 5 April 2004, Maryland's intermediate appellate court filed its opinion in Snowden's appeal and held that, in light of *Crawford*, Wakeel's testimony violated Snowden's right to confrontation because the children were available to testify and their statements during the interview with Wakeel were sufficiently testimonial in nature. *Snowden v. State*, 156 Md.App. 139, 157, 846 A.2d 36, 47 (2004).

The State sought review in this Court by petition for writ of certiorari. We granted its petition, 381 Md. 677, 851 A.2d 596 (2004), in order to decide the following question, which we have rephrased for clarity:

> Did the Court of Special Appeals err in holding that the introduction of hearsay evidence, pursuant to Md.Code (2001), § 11–304 of the Criminal Procedure Article, violated Snowden's right to confrontation under the Sixth Amendment to the United States Constitution in light of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)?

## II.

The Confrontation Clause of the U.S. Constitution [9] provides that "[i]n all criminal prosecutions, the accused shall

---

9. The protections of the Confrontation Clause are applicable to the States through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Article 21 of the Maryland Declaration of Rights (MDR) is Maryland's counterpart to the Confrontation Clause and provides that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him." This Court often has construed the Confrontation Clause and Article 21 of the MDR to be in *pari materia*. *Simmons v. State*, 333 Md. 547, 555

enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Although the Confrontation Clause appears to guarantee a defendant the right to confront his or her accusers face-to-face at trial, the Supreme Court has stopped short of proclaiming this right absolute. *See Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (holding that the Confrontation Clause is not violated when the State presents the testimony of a child victim through the use of closed circuit television). In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), for example, the Supreme Court considered the impact of the Confrontation Clause on the admissibility of hearsay declarations in criminal trials. The Supreme Court held that

> when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66, 100 S.Ct. at 2539, 65 L.Ed.2d 597.

Following *Roberts,* many States enacted statutes allowing the admission into evidence of certain hearsay statements in criminal trials. In 1988, Maryland enacted its tender years statute, first codified at Md.Code (1973, 1989 Repl.Vol.), § 9–103.1 of the Courts and Judicial Proceedings Article.[10] The tender years statute allows a court to admit into evidence in a juvenile proceeding or criminal trial hearsay statements by victims [11] of child abuse if the statements were made to certain

---

n. 1, 636 A.2d 463, 467 n. 1 (1994) (citing *Craig v. State,* 322 Md. 418, 430, 588 A.2d 328, 334 (1991)).

**10.** The statute was moved in 1996 to Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 775, and most recently recodified in 2001 at its current location, Md.Code (2001), § 11–304 of the Criminal Procedure Article.

**11.** The statute requires that the victim declarant be under the age of 12.

health or social work professionals [12] in the course of their professions. Md.Code (2001), § 11–304 of the Criminal Procedure Article. The legislation was enacted in response to concerns that child abuse and sexual offenses were not being prosecuted adequately due to many child victims' inability to testify as a result of their young age or fragile emotional state. *See* Letter from J. Joseph Curran, Jr., Attorney General of Maryland to the Honorable Walter Baker, Chairman of the Senate Judicial Proceedings Committee (Senate Bill 66 of 1998) 1 (3 February 1988) (on file at Maryland State Law Library) (finding that "a hearsay exception is necessary in cases where the age or emotional state of the child precludes the child from testifying"). The statute eliminated this concern by allowing the evidence to be presented by someone other than the vulnerable or legally incompetent child.

To satisfy the constitutional requirements of *Roberts*, the Maryland Legislature imposed safeguards in the tender years statute intended to insure that any admitted statement possessed "particularized guarantees of trustworthiness." Md. Code (2001), § 11–304(d)–(f) of the Criminal Procedure Article. First, the statute requires that, if the child does not testify at trial, the State must produce corroborative evidence demonstrating that the defendant had the opportunity to commit the alleged abuse.[13] *Id.* § 11–304(d)(2). The statute also requires that the trial court conduct a hearing to deter-

---

12. Section 11–304(c) provides:

(c) *Recipients and offerors of statement.*—An out of court statement may be admissible under this section only if the statement was made to and is offered by a person acting lawfully in the course of the person's profession when the statement was made who is:

 (1) a physician;

 (2) a psychologist;

 (3) a nurse;

 (4) a social worker; or

 (5) a principal, vice principal, teacher, or school counselor at a public or private preschool, elementary school, or secondary school.

13. In this case, the trial judge found that the credibility of the children and Tiffany's mother, combined with Snowden's letter of apology admitting to touching the girls, satisfied the requirement of corroborative evidence.

mine whether the proposed statements possess "particularized guarantees of trustworthiness." *Id.* § 11–304(e)–(g). The statute contains a list of non-exclusive factors that the judge must consider in making this determination.[14] *Id.* § 11–304(e)(2). The judge must examine the child victim in chambers, closed to all except the judge, the victim, the victim's attorney, and one attorney each for the defendant and the prosecution. *Id.* § 11–304(g). The judge must then make a finding, on the record, as to "the specific guarantees of trustworthiness that are in the statement." *Id.* § 11–304(f)(1). The defendant also has an opportunity to depose the health or social work professional whose testimony the State intends to offer. *Id.* § 11–304(d)(4).

In the original enactment of the statute, the statements of the health or social work professional could be admitted only if the child was available and testified at the criminal proceeding or was unavailable due to death, absence from the jurisdiction, serious physical disability, or inability to communicate due to severe emotional distress. Md.Code (1973, 1989 Repl.Vol.),

---

**14.** These factors are:

(i) the child victim's personal knowledge of the event;

(ii) the certainty that the statement was made;

(iii) any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion;

(iv) whether the statement was spontaneous or directly responsive to questions;

(v) the timing of the statement;

(vi) whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience;

(vii) the appropriateness of the terminology of the statement to the child victim's age;

(viii) the nature and duration of the abuse and neglect;

(ix) the inner consistency and coherence of the statement;

(x) whether the child victim was suffering pain or distress when making the statement;

(xi) whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement;

(xii) whether the statement was suggested by the use of leading questions; and

(xiii) the credibility of the person testifying about the statement.

Md.Code (2001), § 11–304(e)(2) of the Criminal Procedure Article.

§ 9–103.1(c)(2)(i) of the Courts and Judicial Proceedings Article. In 1994, the Legislature amended the statute so that it could be utilized regardless of whether the child was available to testify. 1994 Md. Laws, Chap. 169, § 1. In *Prince v. State*, 131 Md.App. 296, 748 A.2d 1078 (2000), the Maryland tender years statute was found constitutional by the Court of Special Appeals under the then-extant Supreme Court Confrontation Clause jurisprudence, principally relying on *Roberts*.

On 8 March 2004, the Supreme Court fundamentally altered its Confrontation Clause jurisprudence when it decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the defendant, Michael Crawford, had been found guilty of assault based on a tape-recorded statement by his wife made to the police. *Id.* at 1357–58. Crawford's wife was unavailable to testify at trial. Crawford objected to the use of his wife's statement, arguing that the admission of her statement without any ability to cross-examine her violated his rights under the Confrontation Clause. *Id.* at 1358. The trial court admitted into evidence her recorded statement, based on a recognized hearsay exception, even though the defendant did not have an opportunity to cross-examine her. *Id.* at 1357–58.

On direct appeal, the Washington Court of Appeals reversed Crawford's conviction, finding that his wife's statements, under a *Roberts* analysis, did not bear particularized guarantees of trustworthiness. *Id.* at 1358. The Washington Supreme Court, however, reinstated Crawford's conviction, relying also on a *Roberts* analysis, but concluding that his wife's statements were indeed sufficiently trustworthy. *Id.* at 1358–59

■ The Supreme Court in *Crawford* held that the introduction of the wife's recorded statements violated the defendant's rights under the Confrontation Clause. *Id.* at 1374. After tracing the origins of the Clause, the Court concluded that the *Roberts* test was fundamentally incompatible with the Framers' vision and interpretation of the Clause. *Id.* at 1369–74. The Court instead held that the Confrontation Clause mandates that testimonial statements may not be offered into

evidence in a criminal trial unless two requirements are satisfied: 1) the declarant/witness is unavailable, and 2) the defendant had a prior opportunity to cross-examine the declarant/witness. *Id.* at 1374.

The Supreme Court found fault with the perceived unpredictability and subjectivity of the "indicia of reliability" test in *Roberts.* In overruling *Roberts,* the Court stated:

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id.* at 1370.

*Crawford* also drew a sharp distinction between those out of court statements that may be classified as "testimonial" and those that may not. *Id.* at 1363–65. Finding that the "principal evil at which the Confrontation Clause was directed was . . . [the] use of *ex parte* examinations as evidence against the accused," the Court rejected the notion that the Clause merely applied to in-court testimony. *Id.* at 1363–64. Instead, the Clause's mention of " 'witnesses' against the accused" was interpreted to include, at the very least, those who "bear testimony." *Id.* at 1364 (citations omitted). Therefore, the Court found that when an out-of-court statement qualifies as testimonial, the Constitution conditions its admission on the unavailability of the witness and a prior opportunity to cross-examine.[15] *Id.* at 1365–67.

---

15. The Court held that, where a statement is nontestimonial, "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 124 S.Ct. at 1374. Although Chief

Although the Supreme Court declined to frame a "comprehensive" definition of "testimony," it listed several characteristics of a testimonial statement. The Court began by addressing what is "testimony":

"Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Id.* at 1364 (citations omitted).

Rather than articulate a singular standard, the Court offered three proposed formulations to exhibit the "core class" of what is "testimonial" for Confrontation Clause purposes:

---

Justice Rehnquist, in a concurring opinion, argued that the Framers contemplated that the Confrontation Clause would not be implicated by the inclusion of testimonial statements through certain hearsay exceptions, the *Crawford* majority found "scant evidence" that such testimonial statements would have been admitted in a criminal case at the time of the adoption of the Sixth Amendment. *Id.* at 1367. The majority found that most of the "firmly-rooted" hearsay exceptions, such as business records, or statements made in the furtherance of a conspiracy, were inherently nontestimonial and, thus, their inclusion would not implicate the Clause. *Id.*

In so holding, the *Crawford* Court cast doubt on its holding in *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), which involved the admittance of statements by a child victim to an investigating officer under the spontaneous declaration exception to the hearsay rule. *Crawford*, 124 S.Ct. at 1368 n. 8. The *Crawford* Court found that the only question resolved in *White* was "whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue," and did not address the issue of whether testimonial statements could be admitted even if the witness was unavailable. *Id.*

The *Crawford* Court, however, did acknowledge one exception to its rule prohibiting testimonial hearsay without a finding of unavailability and a prior opportunity to cross-examine:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

*Id.* at 1367 n. 6 (citations omitted).

"[1] *ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [2] "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"; [3] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* (citations omitted).

█ As the Court noted, these standards share a common nucleus in that each involves a formal or official statement made or elicited with the purpose of being introduced at a criminal trial. *Id.* at 1364, 1367, n. 7 (finding that statements are testimonial where "government officers [are involved] in the production of testimony with an eye toward trial"). Although these standards focus on the objective quality of the statement made, the uniting theme underlying the *Crawford* holding is that when a statement is made in the course of a criminal investigation initiated by the government, the Confrontation Clause forbids its introduction unless the defendant has had an opportunity to cross-examine the declarant. *Id.* at 1364.

The introduction of a witness's statements made during police interrogation was offered as a prime example of the potential abuses that the Clause was intended to prevent. *Id.* at 1364–65. The Court emphasized the nature of statements made to police officers in the course of an investigation as being especially testimonial:

Statements taken by police officers in the course of investigations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The state-

ments are not *sworn* testimony, but the absence of oath was not dispositive.

\* \* \*

That interrogators are police officers rather than magistrates does not change the picture either. Justices of the peace conducting examinations under the Marian statutes were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function. England did not have a professional police force until the 19th century, so it is not surprising that other government officers performed the investigative functions now associated primarily with the police. The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace.

\* \* \*

In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.

*Id.* at 1364–65 (citations omitted).

The Court clarified that its use of the term "interrogation" was not meant in its legal or rigid sense, but rather its colloquial or general meaning. *Id.* at 1365 n. 4. The Court, however, did emphasize the formal nature of police questioning in its articulation of when an "interrogation" occurs. *Id.; Hammon v. State,* 809 N.E.2d 945, 952 (Ind.Ct.App.2004) (finding that the "common denominator underlying the Supreme Court discussion [in *Crawford* ] of what constitutes a 'testimonial' statement is the official and formal quality of such a statement"). This characterization is buttressed by the most commonly understood sense of the verb "interrogate": "to question formally and systemically." Merriam Webster's Collegiate Dictionary 612 (10th ed.1993). Several courts have relied on this formality of interrogation to distinguish whether a statement to government agents or employees is testimonial. *See, e.g., People v. Cage,* 15 Cal.Rptr.3d 846, 856–57 (Cal.Ct.

App.2004), *cert. granted,* 19 Cal.Rptr.3d 824, 99 P.3d 2 (Cal. Oct. 13, 2004) (finding a child's statement to a police officer at a hospital was not formal and therefore nontestimonial under *Crawford* because the statements were made in a public, neutral location, there was no "structured questioning," and the statements occurred in the course of determining whether a crime had been committed and before any arrest had been made).

■ Other courts have excluded from their definitions of interrogation statements made during investigatory or on-the-scene questioning by police officers responding to an emergency call. *See, e.g., Fowler v. State,* 809 N.E.2d 960, 964 (Ind.Ct.App.2004) (finding that a police officer's "questioning of [the victim] at the scene of the incident just minutes after it occurred does not qualify as classic, 'police interrogation' as referred to in *Crawford* "). Virtually all courts that have considered the matter in a post-*Crawford* setting, however, have interpreted an "interrogation" to include any formal police questioning that occurs after charges are filed or a police report has been made. *See, e.g., People v. Sisavath,* 118 Cal.App.4th 1396, 13 Cal.Rptr.3d 753, 758 (2004) (finding significant, for purposes of determining whether statements made during an interview were testimonial under *Crawford,* the fact that the statements were made after a prosecution was initiated). In the context of "police interrogations," we are directed by *Crawford* to conclude that the proper standard to apply to determine whether a statement is testimonial is whether the statements were made under circumstances that would lead an objective declarant reasonably to believe that the statement would be available for use at a later trial.[16] *Crawford,* 124 S.Ct. at 1364.

---

**16.** Amici supporting Respondent in the present case, the National Association of Criminal Defense Lawyers and the Maryland Criminal Defense Attorneys' Association, propose in their brief that the proper standard for determining the testimonial nature of a statement should be the same standard used in the Supreme Court's Fifth Amendment jurisprudence. Had the *Crawford* Court intended to adopt such a

### III.

■ Using these objective standards in the present case, it is clear that an ordinary person in the position of any of the declarants would have anticipated the sense that her statements to the sexual abuse investigator potentially would have been used to "prosecute" Snowden. The interview questions posed by Wakeel, and the responses elicited, were in every way the functional equivalent of the formal police questioning discussed in *Crawford* as a prime example of what may be considered testimonial. *Id.* at 1364–65.

Most telling is the fact that Wakeel's participation in this matter was initiated, and conducted, as part of a formal law enforcement investigation. The children were interviewed at the behest of Detective Davey of the Montgomery County Police Department, who was actively involved in the investigation. Unlike some cases in which statements to investigators were deemed nontestimonial because they were in the course of ascertaining whether a crime had been committed, *Hammon*, 809 N.E.2d at 952, the children's statements were elicited by Wakeel subsequent to initial questioning of them by the police and after the identity of a suspect was known. *See Sisavath*, 13 Cal.Rptr.3d at 757 (finding that statements objectively could be expected to be used later at trial where complaint and criminal information had been filed, and a preliminary hearing had been held). Indeed, Wakeel testified that she began her investigation with a police report in hand, which stated that "Michael Snowden had sexually abused these children." During Wakeel's interviews, each child also stated that she was aware of the purpose of the questioning, and through each of her answers indicated that she was aware of the illegal (or at least morally or ethically wrong) nature of the touching attributed to Snowden. This awareness of the prosecutorial purpose of the interviews not only satisfies any objective formulation of what is "testimonial," but, in our opinion, demonstrates that the children *actually* were aware

---

standard, we believe it would have done so explicitly. We also shall refrain from adopting such a standard.

that their statements had the potential to be used against Snowden in an effort to hold him accountable for his conduct.

The State argues that the nature of the interviews and the interviewer's employment compel the conclusion that the children's statements were not made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 124 S.Ct. at 1364. We disagree. Even if we were inclined to ignore the children's actual awareness of the purpose of the interviews, any argument as to the logistics or style of the interviews blatantly disregards the undeniable fact that the express purpose of bringing the children to the facility to be interviewed was to develop their testimony for possible use at trial. *See State v. Bobadilla*, 690 N.W.2d 345, 349 (Minn.Ct.App.2004) (finding, post-*Crawford*, that because "the interview was conducted for [the] purpose of developing a case against [the defendant], ... the answers elicited were testimonial in nature"). Although the trial court in this case made no express finding whether the children's statements were testimonial, it made the following observation:

The children were interviewed for the expressed purpose of developing their testimony by Ms. Wakeel, under the relevant Maryland statute that provides for the testimony of certain persons in lieu of a child, in a sexual abuse trial. . . .

The State asks us to ignore this finding, even though it is a factual finding upon which the intermediate appellate court relied almost exclusively to conclude that the children's statements, in light of *Crawford*, were testimonial. *Snowden*, 156 Md.App. at 157, 846 A.2d at 47. Although not dispositive of the question before us, the trial court's finding that the interviews were made for the express purpose of satisfying the requirements of the tender years statute supports strongly our conclusion that the interviews were conducted, and the statements made, in contemplation of a later trial, and thus are testimonial in nature.

Moreover, we find that the structure, location, and style of the interviews actually support the notion that the children's

interviews were a formal and structured interrogation where the responses reasonably would be expected to be used at a later trial. The fact that the interviews were conducted by a licensed sexual abuse investigator, rather than a police officer, is of little persuasive weight in our analysis. The *Crawford* Court uniquely was aware of the danger of confining testimonial statements to those made to police when it stated:

> Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse-a fact borne out time and again throughout a history with which the Framers were keenly familiar.

*Crawford,* 124 S.Ct. at 1367 n. 7.

■ Wakeel's role as interviewer was little different from the role of a police officer in a routine police interrogation. Wakeel became involved only after being contacted by the Montgomery County Police Department, which informed her of the substance of the children's accusations. Because Wakeel was performing her responsibilities in response and at the behest of law enforcement, she became, for Confrontation Clause analysis, an agent of the police department.[17] *See State v. Mack,* 337 Or. 586, 101 P.3d 349, 352 (2004) (rejecting State's argument that child's statements during an interview with a social worker were not testimonial under *Crawford,* based on the finding that the social worker "was acting as an agent for the police ..."); *In re T.T.,* 351 Ill.App.3d 976, 287 Ill.Dec. 145, 815 N.E.2d 789, 801 (2004) (finding post-*Crawford* that "where [a social worker] works at the behest of and in tandem with the State's Attorney with the intent and purpose of assisting in the prosecutorial effort, [the social worker]

---

**17.** The American Prosecutors Research Institute, in its amicus brief supporting the State, points out that merely because the statements were made to an agent of the government is not enough to conclude that a statement is testimonial. Nonetheless, we find that where an objective person in the position of the declarant would be aware that the statement-taker is an agent of the government, governmental involvement is a relevant, and indeed weighty, factor in determining whether any statements made would be deemed testimonial in nature.

functions as an agent of the prosecution"). Although it is preferable for victims of crime to be questioned by law enforcement personnel who have experience in evaluating evidence and witnesses with an eye toward prosecution, because of the nature of child victim witnesses as particularly emotionally fragile, it may be necessary to utilize other personnel possessing training in questioning children that may otherwise be traumatized. *See People v. Vigil*, 104 P.3d 258 (Colo.Ct.App.2004), *cert. granted*, No. 04SC532, 2004 WL 2926003 (Colo. Dec.20, 2004) (finding the fact that the interview was conducted by an investigator trained to interview children did not alter the court's finding that a child's interview was an interrogation under *Crawford*). Wakeel had extensive training in investigating and interviewing abused and neglected children, as well as testifying in court concerning the results of those investigations. As part of her official responsibilities, she worked closely with the Montgomery County law enforcement and judicial systems, not only in this case, but in several other matters. Wakeel's dual roles as interviewer and ultimate witness for the prosecution confirm her function as an arm of the police investigation in this case. Furthermore, even were we to accept the State's argument that Wakeel's responsibility was simply to "assess [the] safety of children in sexual abuse and neglect cases," the presence of Detective Davey during the interviews, and the children's awareness of the detective's presence, overwhelms any argument that the statements were not testimonial because they were not in response to *police* questioning. *Bobadilla*, 690 N.W.2d at 349; *Sisavath*, 13 Cal.Rptr.3d at 758.

The State also argues that the children's statements during the interview are not testimonial due to the "neutral" location of the interview [18] and the "nonauthoritarian" demeanor of the interviewer. To the contrary, the interviews did not take place at a "neutral" location, but at a County-owned and

---

18. The actual room within the Juvenile Assessment Center where the interviews were conducted was described as "small ... with stuffed animals on the walls, a sofa, two chairs, basically; otherwise nondescript."

operated facility unfamiliar to the children and used for the purpose of investigating and assessing victims of child abuse. Although the Juvenile Assessment Center in Rockville may bear little resemblance to the torture chambers of the dread Lord Jeffreys,[19] the Center's express purpose, in a significant way, was to provide a controlled and structured environment for the questioning, or interrogation, of the children about their accounts of a possible crime.

 Furthermore, the asserted lack of an "authoritarian demeanor" on the part of the interviewer in this case does not negate the underlying purpose of the interview and all the participants' awareness of the potential use of the information elicited. Statements in response to structured police interrogation are no less testimonial because the police interrogator expresses empathy or friendship for the interviewee. *See Vigil*, No. 02CA0833, 104 P.3d at 262 (finding that "[a]lthough the interview in this case was conducted in a relaxed atmosphere, with open-ended, nonleading questions, and although no oath was administered at the outset, it nevertheless amounted to interrogation under *Crawford* "). By analogy, the statements made to a sexual abuse investigator are no less testimonial because the investigator uses non-intimidating, age-appropriate interview techniques designed to limit retraumatization. *See In re R.A.S.*, No. 03CA1209, —— P.3d ——,

19. Many of the protections in the American Bill of Rights mirror those found in the English Bill of Rights, which was enacted after James II of England was forced from the throne in 1689 by a protestant army led by William of Orange. *Sources of Our Liberties* 222–44 (Richard L. Perry et al. eds., 1959). Many of the judicial reforms found in the English Bill of Rights came as a response, in part, to the tactics and methods employed by Lord Jeffreys when he presided over the "Bloody Assizes" of 1685. Following the unsuccessful rebellion of the Earl of Argyle and the Duke of Monmouth in 1685, Lord Jeffreys, who was appointed by James II, conducted a campaign of illegal and corrupt trials of the insurrectionists and their supporters, and was infamous for his ruthless and merciless punishments. *Id.* at 226, 236 n. 103. Lord Jeffreys is often invoked in American case law to exemplify the abuses which the Bill of Rights was designed to prevent. *See, e.g., Crawford*, 124 S.Ct. at 1364 (invoking Jeffreys to find that the Framers would not have endorsed the "indicia of reliability" test for Confrontation Clause violations found in *Roberts* ).

slip op. at 7, 2004 WL 1351383 (Colo.Ct.App. June 17, 2004) (finding that a child's statements were testimonial under *Crawford* in the context of age-appropriate questioning by an investigating officer). The record here shows that, even if the atmosphere during the questioning was relaxed, Wakeel impressed upon the children the "serious" and "businesslike" purpose of the interviews.

The American Prosecutors Research Institute's amicus brief argues that the limited cognitive and developmental skills of young children must be taken into account when determining whether a child's statement is testimonial. Although cautious not to dismiss out of hand the research concerning child development pointed to in the amicus brief, we conclude nonetheless that these contentions are not relevant in this case because each child was able facially to give a full and complete account of their experiences with Snowden. This is made apparent by the trial court's findings, based on Wakeel's testimony and the judge's interviews of the children, for purposes of the tender years statute, that the statements of each of the children exhibited "particularized guarantees of trustworthiness."

We therefore are reluctant to accept amicus's generalized contentions that a young child's statement may never be testimonial. Although we recognize that there may be situations where a child may be so young or immature that he or she would be unable to understand the testimonial nature of his or her statements, we are unwilling to conclude that, as a matter of law, young children's statements cannot possess the same testimonial nature as those of other, more clearly competent declarants. Indeed, other courts have found to be testimonial statements by children as young as three years old. *Mack*, 101 P.3d at 349; *See also In re R.A.S.*, No. 03CA1209, —— P.3d ——, slip op. at 1, 2004 WL 1351383 (involving a four year old declarant); *Sisavath*, 13 Cal.Rptr.3d at 755 (same); *but see Cassidy v. State*, 74 Md.App. 1, 29–30, 536 A.2d 666, 679–80 (1988) (finding that a statement by a two year old declarant was not admissible under the Statements made to a Treating Physician exception to the Hearsay Rule because the

child "did not understand the nature or purpose of her interview with [the physician]").

 This concern for the testimonial capacity of young children overlooks the fundamental principles underlying the Confrontation Clause. Even though there are sound public policy reasons for limiting a child victim's exposure to a potentially traumatizing courtroom experience, we nonetheless must be faithful to the Constitution's deep concern for the fundamental rights of the accused. Although the Supreme Court has recognized that the interest of protecting victims may triumph over some rights protected by the Confrontation Clause, it also has concluded that such interests may never outweigh the explicit guarantees of the Clause, including the "right to *meet face to face* all those who appear and give evidence *at trial.*" *Coy v. Iowa,* 487 U.S. 1012, 1019–21, 108 S.Ct. 2798, 2802–03, 101 L.Ed.2d 857 (1988) (citations omitted); *but see Craig,* 497 U.S. at 857, 110 S.Ct. at 3170, 111 L.Ed.2d 666. To this end, the formulations in *Crawford* outlining what is testimonial not only take into account the intentions of the declarant, but also look to the intentions of the person eliciting the statement. 124 S.Ct. at 1367 n. 7. To allow the prosecution to utilize statements by a young child made in an environment and under circumstances in which the investigators clearly contemplated use of the statements at a later trial would create an exception that we are not prepared to recognize.[20] Thus, we are satisfied that an objective test, using an objective person, rather than an objective child of that age, is

---

**20.** The American Prosecutors Research Institute asks us to consider, when determining whether the children's statements are testimonial, the fact that this case involves vulnerable child witnesses. Whether the children's statements are testimonial, however, is a question that has greater constitutional implications for the accused than for the child witness. Amicus's argument that children must be treated differently in the court system generally only becomes relevant once the prosecution decides to call the children to the stand to testify. *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In determining the testimonial quality of a statement, however, it is the circumstances of the statement that is paramount, and not necessarily the nature of some inherent characteristic of the declarant.

the appropriate test for determining whether a statement is testimonial in nature. *See Sisavath*, 13 Cal.Rptr.3d at 758 n. 3 (rejecting the notion that "an 'objective witness' should be taken to mean an objective witness in the same category of persons as the actual witness—here, an objective four-year-old").

■ The State also seemingly relies heavily on the therapeutic nature aspect of the interviews to argue that the statements by the children here are not testimonial. The fact that there is a therapeutic element to the interviews does not eclipse the overriding fact that the interviews were designed to develop testimony that may be used at trial. *See People v. Warner*, 14 Cal.Rptr.3d 419, 429 (Cal.Ct.App.2004), *cert. granted*, 18 Cal.Rptr.3d 869, 97 P.3d 811 (Cal. Sept. 15, 2004) (finding that even though a social worker's interview is "not intended solely as an investigative tool for criminal prosecutions, ... [it is nonetheless] similar to a police interrogation ..."). Although some courts, post-*Crawford*, have found statements nontestimonial because they were made to a physician in the course of seeking and receiving medical treatment, *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284, 291–92 (2004), we do not find that to be the case here. These children were brought into the interview facility not so much for a noninvestigatory purpose, such as medical or psychological treatment, but rather to assist and develop an investigation initiated by the Montgomery County Police Department.[21] Any therapeutic motive, or effect, of Wakeel's involvement with the children is secondary, in terms of proper Confrontation Clause analysis, to the overarching investigatory purpose, and therefore testimonial nature, of the statements elicited during the inter-

---

**21.** Undue focus on a therapeutic element in a testimonial analysis in this case would be myopic. The record indicates that although the interviews with the children brought out evidence of physical abuse, no investigation was made into these allegations because, as Wakeel testified, "the scope of my investigation was the sexual abuse." By only pursuing that which is relevant to the ongoing police investigation, we are comfortable in arriving at our conclusion that the children's statements were taken, and given, in anticipation of their use at trial.

views. *Crawford's* command in this regard is clear. No matter what other motives exist, if a statement is made under such circumstances that would lead an objective person to believe that statements made in response to government interrogation later would be used at trial, the admission of those statements must be conditioned upon *Crawford's* requirements of unavailability and a prior opportunity to cross-examine.

By resolving that Wakeel's testimony was admitted wrongly in Snowden's trial, we do not render useless Maryland's tender years statute. The statutory framework certainly contemplates other circumstances in which a child's non-testimonial statements could be supplied constitutionally by a health or social work professional. *See People v. Geno*, 261 Mich. App. 624, 683 N.W.2d 687, 692 (2004) (finding nontestimonial under *Crawford* a child's statement to the executive director of a children's center where director was not a government employee and child volunteered incriminating information). As one amicus notes, the tender years statute is limited to those medical, psychological, social work, and school-related professions whose primary role, in the context of children, is to promote safety, education, and healthy development. Md. Code (2001), § 11–304(c) of the Criminal Procedure Article. Statements made to a school principal conducting a casual chat with a student, for example, do not present necessarily the same potential constitutional abuses as when a child's statement is made to a health or social work professional that is working in tandem with law enforcement in furtherance of an ongoing and formal criminal investigation. We leave to another day the question of whether such noninvestigatory statements would be admissible in light of *Crawford*.

## IV.

The State also argues that even if the children's statements are testimonial, Snowden waived his rights under the Confrontation Clause because the children were present in the courthouse, if not actually in the courtroom, and available to testify until released following the trial judge's ruling on the admissibility and receipt of Wakeel's testimony. To this end,

the State suggests that Snowden's objections at trial were insufficient to preserve the Confrontation Clause issue because he did not object expressly to the State's failure to call the children as witnesses. Although he may not have objected to the State's failure to place the children in the witness box, we find that Snowden's objections to the use of the social worker's testimony properly preserved his Confrontation Clause arguments for appellate review.

At trial, the following colloquy occurred between the trial judge and Snowden's counsel:

[DEFENSE COUNSEL]: Just so there's no misunderstanding, we are objecting to the procedure itself. We don't—I don't know whether this procedure has been reviewed by our Court of Special Appeals.

THE COURT: Okay. Well, I'll note that there's an objection made to Criminal Procedure 11–304.

But, [Defense Counsel], what I need to know in order to appropriately rule on that is why it's defective.

[DEFENSE COUNSEL]: Well, you're taking away valuable rights from the defendant.

THE COURT: Well, other than the admissibility of hearsay evidence, which is the purpose of the section, the legislative intent of the section, what I need to know is whether or not you are asserting that it is unconstitutional in some fashion and specifically how, and is there any support for such?

[DEFENSE COUNSEL]: Well, the defendant is not able to confront the witnesses.

THE COURT: So that—

[DEFENSE COUNSEL]: The Court is standing between the witnesses and the defendant.

THE COURT: You're asserting that the statute is void as a violation of Article [sic] 6 of the U.S. Constitution and Comparable Rights under the—

[DEFENSE COUNSEL]: 14th Amendment.

THE COURT: Well—

**94**

[DEFENSE COUNSEL]: As applied to the states and—

THE COURT: Well, the 14th Amendment, for sure, but what I'm referring to are the Declaration of Rights within the State of Maryland.

[DEFENSE COUNSEL]: That and the federal guarantees that a defendant has in this case or in any other case.

THE COURT: Well, the Court will entertain any reasoning other than just the statement that it is unconstitutional and denies the guarantees of that amendment and any case law that might support that.

I'm not aware that, one way or another, whether there's been a constitutional challenge to the statute, but I suspect by now there probably has been, to be honest with you, but I don't know.

[DEFENSE COUNSEL]: Well, it's very unusual to take away the right of a defendant to confront his accusers.

THE COURT: Well, the legislature of the State of Maryland recognized that child abuse circumstances were different and unusual.

It provides that the right is limited, it's done so only with the right to admit hearsay evidence, has done so only under very specialized circumstances, and the hearsay may be developed only from certain persons and under the—I think there are 12 conditions.

The trustworthiness that had to be identified and reviewed by the Court as well as the in-camera interview.

So, consequently at this point, I'll deny your motion to—I'll grant the State's motion at least to interview the young ladies to determine whether or not I am satisfied that their testimony may be received through the social worker.

If I'm not, then your client's rights have not been violated as you see it. I'm not sure that they've been violated at all because there is a right for the State to present this under the statute.

All right.

[DEFENSE COUNSEL]: In any event, my objection is duly noted.

THE COURT: Surely

[DEFENSE COUNSEL]: Thank you.

Although it is clear from the record that Snowden objected based on the constitutionality of the tender years statutory framework as utilized in this case, the State nonetheless argues that Snowden's objections are deficient because they "went only to Ms. Wakeel's being allowed to testify to the children's out-of-court statements, not also to the fact that the children would not be called as witnesses by the State." [22] The State's reliance, however, on Snowden's failure to insist that the State place the children on the stand ignores the fundamental principle of the State's threshold burden to produce a prima facie case of the defendant's guilt.

 In a criminal trial, the State is required to place the defendant's accusers on the stand so that the defendant both may hear the accusations against him or her stated in open court and have the opportunity to cross-examine those witnesses. *See, e.g., Coy*, 487 U.S. at 1017, 108 S.Ct. at 2801, 101 L.Ed.2d 857 finding that the Confrontation Clause "provides two types of protections for a criminal defendant: the

---

**22.** The State uses as support for its argument Professor John G. Douglass's theories on the Confrontation Clause espoused in his 1999 law review article, *Beyond Admissibility: Real Confrontation, Virtual Cross–Examination, and the Right to Confront Hearsay*, 67 Geo. Wash. L.Rev. 191 (1999). In his article, Professor Douglass proposes that the State should be able to introduce the statements of an available hearsay declarant without running afoul of the Confrontation Clause, so long as the defendant has the opportunity to call the hearsay declarant as his or her own witness in lieu of cross-examination. *Id*. at 227–28. We believe Professor Douglass's proposal has significant constitutional shortcomings, most importantly relating to the burden of production that is placed on the State to produce affirmatively the witnesses needed for its prima facie showing of the defendant's guilt. *See Lowery v. Collins*, 988 F.2d 1364, 1369–70 (5th Cir.1993) (rejecting as "simply wrong" the State's theory that the defendant waived his Confrontation Clause rights because he did not call his accuser to the stand). Furthermore, we doubt that Professor Douglass's pre-*Crawford* interpretation of the Sixth Amendment has much currency now.

right physically to face those who testify against him, and the right to conduct cross-examination" (*quoting Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987)). In Snowden's case, the State circumvented this right, through use of the tender years statutory framework, by having the social worker testify in place of the children. The burden, however, is on the State, not Snowden, to prove its case through production of witnesses and evidence that conform to the U.S. Constitution and Maryland Declaration of Rights. *See Lowery v. Collins*, 988 F.2d 1364, 1369–70 (5th Cir.1993) (rejecting the State's Confrontation Clause waiver theory because it "unfairly requires the defendant to choose between his right to cross-examine a complaining witness and his right to rely on the State's burden of proof in a criminal case"). When the State undertakes to do this, it is the burden of the defendant to object properly to evidence or witnesses so as to preserve an issue for appellate review. In this case, Snowden objected to the use of the tender years statutory procedure because he felt it denied him the protections of the Confrontation Clause. Implicit in that objection, if well taken, is the demand that the withheld declarants testify. Although Snowden did not object directly to the State's failure to call the children to testify, it does not follow that a defendant waives his or her objections simply because he or she failed to inform the prosecution which evidence or witnesses would be an acceptable substitute.

The State also argues that Snowden's objections fail because they in no wise sounded the complaint raised by Sir Walter Raleigh, ... [who] demanded that his accuser be called, saying "let [Lord] Cobham be here, let him speak it. Call my accuser before my face...."[23] Despite the State's contentions,

---

**23.** The *Crawford* Court identified as the modern origin of the Confrontation Clause the series of statutory and judicial reforms that came in response to the judicial abuses that occurred during the trial of Sir Walter Raleigh in 1603. 124 S.Ct. at 1360. The Court described Raleigh's predicament:

Lord Cobham, Raleigh's alleged accomplice [in his alleged plot against James I], had implicated him in an examination before the

Snowden's objections squarely implicate the fundamental complaints voiced by Raleigh. Snowden made clear in his objections that, in allowing the State to present the children's accusations through the social worker, the trial judge, like the court in Raleigh's case, was "standing between the witnesses and the defendant." Furthermore, Snowden's accusers, like Cobham in Raleigh's case, were not called to testify in court, yet their statements nonetheless were read into court as substantive inculpatory evidence without any opportunity to cross-examine the declarants. *See Crawford*, 124 S.Ct. at 1360 (describing the judges' refusal in Raleigh's trial to bring Cobham before the tribunal for cross-examination, despite Raleigh's objections to his accuser's confession being read to the court). Snowden's objections were in direct response to this inability to "confront" the children about their accusations, a scenario orchestrated by the State and sanctioned by the trial court through the allowance of the tender years statutory framework. Although Snowden did not demand explicitly that the State call the children to testify, we find it sufficient that, in his objections, he did insist that any accusations (including testimonial evidence) presented before the

---

Privy Council and in a letter. At Raleigh's trial, these were read to the jury. Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour." Suspecting that Cobham would recant, Raleigh demanded that the judges call him to appear, arguing that "[t]he Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face...." The judges refused, and, despite Raleigh's protestations that he was being tried "by the Spanish Inquisition," the jury convicted, and Raleigh was sentenced to death.
*Id.* (citations omitted).

The *Crawford* Court found that Raleigh's futile demands to confront and question Cobham during his trial exemplified the abuses that the Confrontation Clause was designed to prevent. *Id.* The State argues that Snowden did not in fact demand that his accusers be called, and further claims that Snowden in fact did not desire to question the children at all. We find, as discussed above, that Snowden's objections at trial implicated the State's declination to call his accusers, a right that Snowden possessed as a criminal defendant no matter what his ultimate intentions.

factfinder conform to the fundamental principles of the Confrontation Clause.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND.