PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

v.

ROBERTO E. DELEON,

    *Defendant-Appellant.*

No. 10-4064

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:09-cr-00095-RDB-1)

Argued: January 26, 2012

Decided: May 15, 2012

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Wynn joined.

## COUNSEL

**ARGUED:** Paresh S. Patel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Paul Michael Cunningham, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Balti-

more, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Paul E. Budlow, Assistant United States Attorney, Julia Jarrett, Student Intern, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

DIAZ, Circuit Judge:

Following a three-week trial, a jury convicted Roberto DeLeon of the second-degree murder and assault of his eight-year-old stepson Jordan Peterson. The district court imposed a mandatory sentence of thirty years in prison for the murder and ten-year concurrent sentence for the assault. On appeal, DeLeon challenges his murder conviction and sentence, asserting various evidentiary claims and contending that the district court erred by making a factual finding at sentencing that should have been submitted to the jury.

Among the issues DeLeon raises is a claim that the introduction of statements describing prior acts of abuse that Jordan made during a meeting with a social worker violated the Confrontation Clause of the Sixth Amendment. Applying Supreme Court precedent beginning with *Crawford v. Washington*, 541 U.S. 36 (2004), we conclude that the primary purpose of the meeting between Jordan and the social worker was nontestimonial and therefore hold that the admission of Jordan's statements did not violate DeLeon's constitutional rights. Finding no merit to any of DeLeon's other claims, we affirm the judgment of the district court.

I.

At the time of Jordan Peterson's death, Roberto DeLeon lived with his wife, Air Force Staff Sergeant Sabrina DeLeon,

and her two children near Kadena Air Base in Okinawa, Japan. While Staff Sergeant DeLeon was working at the base, DeLeon assumed many of the childcare responsibilities for his wife's eight-year-old son Jordan and nine-year-old daughter AD,[1] Jordan's half-sister. On the day Jordan died, DeLeon was home alone with the children when Jordan began complaining that his stomach hurt and that he had a headache. In response to Jordan's complaints, DeLeon, who was upset with Jordan for failing to complete his chores, instructed him to take a shower. While showering, Jordan collapsed. Efforts by DeLeon and medical personnel to revive Jordan were unsuccessful, and he died around midday.

An autopsy revealed that Jordan died from hemorrhaging due to a lacerated liver caused by blunt force to his abdomen. The autopsy also showed bruising to Jordan's face, torso, and buttocks that the medical examiner concluded was the result of blunt force injuries. Based on the nature and severity of the injury to Jordan's liver, the medical examiner determined that it could not have been caused by a fall or accident. Instead, the medical examiner concluded—and DeLeon's medical expert agreed—that Jordan's death was a homicide. The medical examiner estimated that the fatal blow to Jordan's abdomen occurred six to twelve hours before he collapsed.

No witness testified to having observed the blow that caused Jordan's death. As such, the case against DeLeon was based almost exclusively on circumstantial evidence. The government's theory was that DeLeon—who had a history of using corporal punishment as a means of discipline—struck Jordan, causing the laceration to his liver. The extensive evidence of DeLeon's punishment methods included testimony that DeLeon spanked Jordan with a belt, scratched him, pinched him, poked him in the chest, twisted his ear, forced him to hold his hands out with a hammer, stepped on his back,

---

[1]In the briefs, the parties refer to AD by her initials. We continue that practice here.

and forced him to do sit-ups and pushups. At various times, the effects of DeLeon's disciplinary tactics caught the attention of others, including a social worker who provided treatment to Jordan's family, a local Japanese woman who found Jordan on the streets of Okinawa, and Jordan's half-sister.[2]

Approximately five months before his death, Jordan and his family met with Beth Thomas, a licensed social worker serving as the treatment manager with the Air Force Family Advocacy Program ("FAP"). Jordan's teacher had referred Jordan to the FAP after she observed a bruise on his forehead. The FAP "is a medical program that enhances Air Force readiness by promoting family and community health and resilience and advocating for nonviolent communities." J.A. 2973. One purpose of the FAP is to "prevent and treat child . . . maltreatment." *Id.*

Thomas met with Jordan and each of his family members individually to discuss the reported "offense." *Id.* at 1480. During the initial interview, Jordan told Thomas that DeLeon punished him by spanking him with an open hand and a belt and forcing him to hold a hammer for several minutes while leaning down. In response to Thomas's question about a bruise on his forehead, Jordan explained that DeLeon caused the bump when he punished Jordan for running away from home by forcing Jordan to lie on the floor while DeLeon kneeled and stood on Jordan's back. Following the meetings with Jordan and his family, Thomas concluded that the circumstances presented a substantiated claim of "minor physical" abuse, as opposed to "moderate" or "major" abuse. *Id.* at 1598. Thomas had several subsequent meetings with Jordan and his family to provide counseling and advice on parenting techniques.

---

[2]The evidence of DeLeon's use of corporal punishment also included admissions he made to others and testimony from Staff Sergeant DeLeon.

Shortly before the FAP referral, a Japanese woman, Hisa Uechi, found Jordan barefoot and shirtless on the streets of Okinawa. Jordan explained to Uechi, who spoke limited English, that he had run away from home and was headed to the airport to return to the United States. Uechi observed bruises on Jordan's face and forehead and offered to buy him clothes and shoes at a nearby store. Jordan declined the offer, stating, "No, don't do it. If my dad found out, he will do bad things." *Id.* 1297. With the assistance of a store employee, Uechi contacted the police, who returned Jordan to his family.

In the days following Jordan's death, his half-sister AD participated in two separate videotaped interviews with investigators. During the interviews, AD stated that DeLeon used corporal punishment, including spanking and pinching, to discipline her and Jordan. AD also told the investigators that she saw DeLeon "punch" or strike Jordan in the stomach on two or three occasions, beginning the month prior to Jordan's death. AD demonstrated how DeLeon had Jordan stretch out his arms prior to striking him and then mimicked Jordan's reaction. After initially describing the strike as a punch, AD clarified that she could not see DeLeon's hand and did not know if he used a closed fist. Investigators also asked AD to draw a picture indicating where DeLeon struck Jordan.

Nearly a year later, AD recanted her statements during testimony before a federal grand jury considering charges against DeLeon. AD denied ever having seen DeLeon hit Jordan in the stomach and stated that she lied to investigators during the interviews following Jordan's death. AD also denied the statements at trial. The court nevertheless allowed the government, over DeLeon's objection, to play videotapes of AD's interviews for the jury.

The jury found DeLeon guilty of second-degree murder, in violation of 18 U.S.C. § 1111(a), and assault causing serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). At sentencing, the district court found that Jordan was under the age

of eighteen and that DeLeon was therefore subject to manda-
tory prison terms of thirty years for the murder conviction and
ten years for the assault. The court overruled DeLeon's objec-
tion that Jordan's age was a question of fact that should have
been submitted to the jury. The court ordered DeLeon's sen-
tences to run concurrently for a total of thirty years in prison.

Before us, DeLeon contends that the district court erred by
(1) admitting Thomas's hearsay testimony in violation of
DeLeon's constitutional right to confrontation, (2) admitting
the hearsay testimony of Thomas, Uechi, and AD in violation
of the rules of evidence, (3) limiting his defense expert's testi-
mony, (4) admitting impermissible character evidence of
DeLeon's prior acts of physical punishment, and (5) treating
the issue of Jordan's age as a sentencing factor to be deter-
mined by the court. We address each claim in turn.

## II.

DeLeon contends that the district court violated his rights
under the Sixth Amendment Confrontation Clause when it
admitted out-of-court statements Jordan made to Thomas dur-
ing their initial meeting. Specifically, DeLeon objects to the
admission of Jordan's statements describing DeLeon standing
and kneeling on Jordan's back as punishment for running
away from home, incidents of spanking by DeLeon using his
hand and a belt, and DeLeon requiring Jordan to hold a ham-
mer for several minutes while leaning down. Reviewing the
alleged Confrontation Clause violation de novo, *United States
v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010), we conclude that
the statements were nontestimonial and therefore affirm the
district court's ruling.

## A.

The Sixth Amendment provides that "[i]n all criminal pros-
ecutions, the accused shall enjoy the right to . . . be confronted
with the witnesses against him." U.S. Const. amend. VI. The

Supreme Court has explained that "the principal evil at which the Confrontation Clause was directed was . . . [the] use of ex parte examinations as evidence against the accused." *Crawford*, 541 U.S. at 50. To that end, the Court held in *Crawford* that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54.

In *Crawford*, the Court ruled that the introduction of out-of-court statements made by the defendant's wife in response to formal police interrogation violated his rights under the Confrontation Clause. In so doing, the Court overruled *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which had permitted hearsay statements of unavailable witnesses that bore "adequate indicia of reliability." Instead, the Court focused the Confrontation Clause's protection on testimonial statements. The Court opted to "leave for another day," however, "any effort to spell out a comprehensive definition of 'testimonial,' " noting that "at a minimum" testimonial statements included "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; [as well as] police interrogations." *Id.* at 68.

Two years later, in *Davis v. Washington*, 547 U.S. 813 (2006), the Court considered whether out-of-court statements in a pair of companion domestic-disturbance cases were testimonial and thus implicated the Sixth Amendment. The first case involved statements the victim made to a 911 operator during the actual commission of the offense. The Court concluded that these statements were nontestimonial because the "primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. In the second case, however, the Court concluded that the victim's statements at the scene of a domestic disturbance were testimonial because the victim "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed" and spoke with officers "some time after the events described were over." *Id.* at 830.

Contrasting the two cases, the Court held as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. *Davis* therefore clarified that courts must examine the "primary purpose" of an interrogation to determine whether statements are testimonial.

More recently, in *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011), the Court held that statements made by a gunshot wound victim to first responders identifying the shooter and describing the circumstances of the shooting were nontestimonial. The *Bryant* Court reinforced that "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Id.* at 1155. Analogizing to *Davis*, the Court reasoned that the primary purpose of the interrogation of the victim was to enable police to respond to the "ongoing emergency" or threat posed by the at-large shooter, not "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 1150, 1165 (quoting *Davis*, 547 U.S. at 822).

Discussing the "primary purpose" inquiry, the Court instructed that "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of

the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 1162. The Court emphasized the objective nature of the test, stating that "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had." *Id.* at 1156.

B.

Against this backdrop, we consider DeLeon's claim that introduction of Jordan's out-of-court statements to Thomas violated his constitutional rights. Over DeLeon's objection, the district court permitted Thomas to testify to statements Jordan made during their meeting at the FAP, concluding that there was no "primary purpose to establish facts for a later prosecution." J.A. 1527. As such, the court ruled that the statements were nontestimonial and therefore did not implicate the Confrontation Clause. Based on our review of the objective indications of the parties' primary purpose and the circumstances of the meeting, we agree and hold that admission of the statements did not violate the Sixth Amendment.

As an initial matter, the record does not show that Thomas faced an "ongoing emergency"—similar to those present in *Davis* and *Bryant*—when Jordan and his family arrived following the referral from his teacher. In *Bryant*, the Court explained that "[t]he existence of an emergency . . . is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial." 131 S. Ct. at 1162. In this case, the injury that led Jordan's teacher to make the referral had occurred several days earlier. Moreover, although Thomas found after meeting with Jordan and his family that the circumstances presented a substantiated claim of "minor physical" abuse that required further counseling, we cannot say that she (or Jordan) intended to develop information to allow authorities to respond to an

ongoing emergency.[3] But this conclusion does not end our inquiry, for we still must objectively evaluate the primary purpose of both parties and the circumstances of the interview to determine whether Jordan's statements were testimonial. *See Bryant*, 131 S. Ct. at 1155 ("[T]here may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.").

In support of his argument that the purpose of the interview was to establish facts relevant to a future criminal prosecution, DeLeon focuses on the structure and design of the FAP. There is no gainsaying that the FAP is designed to prevent and intervene in situations involving child and spousal abuse in military families. And although the program is part of the Air Force's medical command, it utilizes both medical and security personnel and requires them to report and investigate allegations of family maltreatment. Consistent with this structure, Thomas acknowledged that she worked with law enforcement when necessary in her capacity as the FAP treatment manager.

But although the FAP incorporates reporting requirements and a security component, these factors alone do not render Jordan's statements to Thomas testimonial. Courts have not treated such factors as determinative when examining whether statements were provided for the purpose of future criminal prosecution. For example, in *United States v. Peneaux*, 432 F.3d 882, 895 (8th Cir. 2005), the Eighth Circuit rejected an argument that statements made to a physician were testimonial because he worked for a center that was part of "a collaborative effort between the medical system, law enforcement, social services, and the judiciary." Instead, the *Peneaux* court examined the purpose of the encounter that led to the con-

---

[3]We do not suggest that ensuring a child's safety and removal from an abusive home could never present an ongoing emergency under *Davis* and *Bryant.* We simply find that the facts do not support such a finding here.

tested statements, concluding that the statements were for the purposes of diagnosis and treatment and were therefore non-testimonial. *Id.* at 896.

State supreme courts have reached similar conclusions. In *Seely v. State*, 282 S.W.3d 778, 788 (Ark. 2008), for example, the Arkansas Supreme Court concluded that a social worker's duty to report child abuse did not, by itself, render the child victim's statements testimonial. Similarly, in *State v. Spencer*, 169 P.3d 384, 389 (Mont. 2007), the Supreme Court of Montana ruled that mandatory reporting laws were not "intended to deputize [mandatory reporters] into law enforcement."

Because the structure and requirements of the FAP do not conclusively resolve whether Jordan's statements are testimonial, we proceed to an objective examination of the primary purpose of the parties and the circumstances of the interview. We note first that Thomas did not have, nor did she tell Jordan that she had, a prosecutorial purpose during their initial meeting. Thomas was not employed as a forensic investigator but instead worked for the FAP as a treatment manager. And there is no evidence that she recorded the interview or otherwise sought to memorialize Jordan's answers as evidence for use during a criminal prosecution.

In that sense, this case is unlike the situation confronted by the Eighth Circuit in *United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005), where the court concluded that a child victim's statements were testimonial based, in part, on the fact that the interrogation was videotaped and was conducted by a "forensic interviewer." Rather, Thomas used the information she gathered from Jordan and his family to develop a written treatment plan and continued to provide counseling and advice on parenting techniques in subsequent meetings with family members. These actions are consistent with Thomas's testimony that, in cases like this one, her "primary purpose [was] to provide the treatment and assistance that the family needs." J.A. 1482.

Evaluating the primary purpose of a child declarant like Jordan is a bit more difficult. In analyzing whether statements made by a child were testimonial, courts have not treated the young age of a declarant as determinative but instead have considered age as one of the "relevant circumstances." *E.g.*, *Commonwealth v. Allshouse*, 36 A.3d 163, 181–82 (Pa. 2012) (holding that a four-year-old's statement to a child services caseworker that her father caused her brother's injury was nontestimonial). In another case involving child declarants, the Maryland Court of Appeals held that child victims' responses to questions by a social worker employed as a child abuse investigator were testimonial. *State v. Snowden*, 867 A.2d 314, 325 (Md. 2005). In so doing, the *Snowden* court found it significant that the interviewer explained the investigatory purpose of the interview to the child victims and had them verify that they were "aware of the purpose of the questioning." *Id.* at 325–26. In contrast, Thomas did not tell Jordan that his answers would be reported to the legal authorities, and there is no evidence that Jordan believed otherwise.

Considering the question de novo, we are satisfied—after reviewing Thomas and Jordan's conduct and statements—that the primary purpose of reasonable participants in such a meeting would not have been the preservation of evidence for a future criminal prosecution. A review of the circumstances of the meeting reinforces our conclusion. Jordan came to the meeting with his family, including his mother, half-sister, and DeLeon. Although protocol required that Thomas meet with each family member independently, no effort was made to separate Jordan from DeLeon in the waiting area. Thomas also did not meet with Jordan in an interrogation room or at a police station but instead spoke with him in her office in a building that housed the FAP, as well as other mental health service providers. In short, the interview between Thomas and Jordan simply does not bear the hallmarks of a testimonial interrogation.

Importantly, ours is also not a case in which the social worker operated as an agent of law enforcement. By comparison, in *Bobadilla v. Carlson*, 575 F.3d 785, 793 (8th Cir. 2009), the Eighth Circuit held that a child victim's statements to a social worker were testimonial because the interrogation was "initiated by a police officer to obtain statements for use during a criminal investigation." The statements were also videotaped and "involved structured questioning designed to confirm a prior allegation of abuse." *Id.* Similarly, in *Snowden*, Maryland's high court emphasized that the social worker's participation was "initiated, and conducted, as part of a formal law enforcement investigation" and that the police were present for the interview and "actively involved in the investigation." *Id.* at 325. Here, Thomas did not act at the behest of law enforcement, as there was no active criminal investigation when she and Jordan spoke. There is also no evidence that the discussion was videotaped or otherwise preserved as evidence or that another party listened in on or secretly observed the meeting.

An objective review of the parties' actions and the circumstances of the meeting confirms that the primary purpose was to develop a treatment plan—not to establish facts for a future criminal prosecution. Accordingly, we hold that the contested statements were nontestimonial and that their admission did not violate DeLeon's Sixth Amendment rights.

III.

In addition to his constitutional claim, DeLeon contends that the district court violated the rules of evidence by admitting the hearsay statements of three witnesses: Thomas, Uechi, and AD. We review rulings on the admissibility of evidence for abuse of discretion and will only overturn an evidentiary ruling that is arbitrary and irrational. *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011). Furthermore, under harmless error review, we must disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial

rights." Fed. R. Crim. P. 52(a). An error is harmless unless it had "a substantial and injurious effect or influence," meaning it affected the jury's verdict. *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011) (quoting *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (en banc)). After careful review, we affirm each of the district court's contested hearsay rulings.

A.

DeLeon contends that the district court violated the rules of evidence by admitting Jordan's out-of-court statement to Thomas accusing DeLeon of causing the bruise to his forehead. Over DeLeon's objection, the trial court admitted the statement under the exception for statements made for purposes of medical diagnosis or treatment, as well as under the residual hearsay exception. Finding no abuse of discretion, we affirm.

Rule 803(4) provides that "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause" is not excluded by the rule against hearsay. Under the two-part test used to determine whether the exception for statements made for medical diagnosis or treatment applies "(1) the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and, (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988) (internal quotation marks omitted).

Courts have not restricted application of the exception to physicians or nurses but have admitted statements made to therapists or social workers as well. *E.g.*, *United States v. Kappell*, 418 F.3d 550, 556 (6th Cir. 2005) (collecting cases). And we have declined to apply a heightened test of admissi-

bility for statements made by a child, stating that "a young child will have the same motive to make true statements for the purposes of diagnosis or treatment as an adult." *Morgan*, 846 F.2d at 949. The residual hearsay exception, codified in Rule 807, permits admission of a hearsay statement for the truth of the matter asserted if the following conditions are satisfied:

> (1) the statement has . . . circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of [the rules of evidence] and the interests of justice.

Fed. R. Evid. 807. We have emphasized that the residual hearsay exception "is a narrow exception that should not be construed broadly." *United States v. Dunford*, 148 F.3d 385, 394 (4th Cir. 1998) ("To construe it broadly would easily cause the exception to swallow the rule.").

Here, the district court's decision to admit Jordan's statement under the exception contained in Rule 803(4) was not arbitrary or irrational. Thomas described in detail her credentials and experience as a social worker, including extensive work with children. She testified that she asked Jordan specific questions to gauge his credibility and to ensure he was answering truthfully. We therefore cannot say that the district court abused its discretion by concluding that Jordan's motive was consistent with the purposes of treatment. Furthermore, Thomas properly relied on Jordan's responses, including his description of the injury to his forehead, to develop a treatment plan for the family. Accordingly, we affirm the district court's decision to admit the contested statements on the ground that they were made for medical diagnosis or treatment.

We also conclude that the district court did not abuse its discretion by admitting Jordan's statement under the alternative grounds of the residual hearsay exception. Thomas's credentials and use of specific questions to verify Jordan's truthfulness support the trial court's conclusion that the statement had circumstantial guarantees of trustworthiness. Given that the government's case against DeLeon was largely circumstantial, the evidence of DeLeon standing and kneeling on Jordan's back to the point that it caused a visible injury to his forehead was certainly material. And because Jordan was deceased there was no more probative evidence of the encounter than his description to Thomas. Under the deferential abuse-of-discretion standard, we affirm the district court's ruling.

## B.

Uechi, who found Jordan after he ran away from home nearly five months prior to his death, testified that when she offered to buy Jordan clothing and shoes, he responded, "No, don't do it. If my dad found out, he will do bad things." J.A. 1297. DeLeon objected, contending that the testimony amounted to a statement that DeLeon had done bad things to Jordan in the past and was therefore impermissible hearsay. The district court overruled DeLeon's objection, concluding that "there's no assertion of any fact . . . being offered for the truth of the matter asserted therein," *id.* 1226, and that the statement was nevertheless admissible under the state of mind exception to the hearsay rules. We find that any error committed by admitting the statement was harmless.

Under Rule 803(3), "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . , but not including a statement of memory or belief to prove the fact remembered or believed," is not excluded by the hearsay rule. Fed. R. Evid. 803(3). DeLeon contends that Uechi's testimony was inadmissible because it went beyond describing Jordan's existing state of mind but instead

described why Jordan was afraid. *See United States v. Liu*, 960 F.2d 449, 452 (5th Cir. 1992) ("Evidence of [the declarant's] fear was [properly] admitted. . . . Properly excluded were the alleged reasons for that fear.")

We doubt that Jordan's statement speculating about DeLeon's future actions was a statement of fact offered for its truth. *See* Fed. R. Evid. 801 (defining hearsay as "a statement . . . offered in evidence to prove the truth of the matter asserted"). Here, however, we need not decide whether Uechi's testimony qualified as hearsay or was otherwise admissible under the state of mind exception because the record is replete with evidence of DeLeon's use of physical means to punish Jordan and his reaction to that punishment. Uechi's brief testimony regarding Jordan's concern that DeLeon would do "bad things" was therefore cumulative and did not have a substantial or injurious effect on the jury's verdict. Accordingly, the error, if any, was harmless.

## C.

AD, Jordan's nine-year-old half sister, participated in two videotaped interviews with investigators in which she described DeLeon's use of physical punishment and stated that she had seen DeLeon "punch" or strike Jordan in the stomach with his hand. AD later recanted the statements related to DeLeon punching Jordan, both in her grand jury testimony, as well as in her live testimony during trial. Over DeLeon's objection, the district court admitted AD's videotaped statements as substantive evidence under the residual exception to the hearsay rule. DeLeon contends that the court's ruling stretches the residual exception too far. We find no abuse of discretion.

In *Dunford*, we considered a district court's decision to admit, under the residual hearsay exception, the out-of-court statements of child abuse victims who later recanted. 148 F.3d at 387. Dunford was convicted of drug and gun offenses

based in part on out-of-court statements made by his daughters, accusing him of child abuse and gun possession. *Id.* at 387–88. At trial, Dunford's daughters recanted their prior statements. The trial court nevertheless admitted, under the residual exception, the hearsay testimony of social service workers, a police officer, and an assistant principal describing the incidents of abuse. *Id.* at 392. We found no abuse of discretion, emphasizing that "[t]he serious nature of the repeated statements made by the children to government officials as well as the consistency of their stories given to those officials provide clear indicia of the trustworthiness of their statements." *Id.* at 393.

Other circuits have interpreted the residual hearsay exception similarly in cases involving allegations of child abuse. In *United States v. Harrison*, 296 F.3d 994, 995 (10th Cir. 2002), the Tenth Circuit considered whether statements by an alleged child abuse victim to law enforcement were admissible under the residual hearsay exception when the declarant later recanted. The court found no abuse of discretion in admitting the statements, highlighting "the consistency of the statement with two other admissible statements of the victim made in circumstances suggestive of trustworthiness, the professionalism of the law enforcement interrogator who elicited the statement, and the compelling detail of the statement." *Id.* at 995. Similarly, in *Peneaux*, the Eighth Circuit affirmed the admission of a child sex abuse victim's prior statements under Rule 807 despite her later denial of any abuse. 432 F.3d at 893. The *Peneaux* court relied on the consistency of the prior statements, the declarant's use of "language appropriate for a young child," and the "open ended questions" of those that interviewed the declarant about the abuse. *Id.* at 892.

Examining the factors set forth in Rule 807, we find sufficient circumstantial guarantees of trustworthiness to support the trial court's discretionary decision to admit AD's statements. In two separate meetings with investigators shortly after Jordan's death, AD provided consistent accounts

describing how DeLeon "punched" or struck Jordan. AD's statements were detailed and contained age-appropriate language describing Jordan's reaction to the abuse, referring to Jordan's "wee wee" and stating that Jordan complained his "bad spot" hurt. J.A. 3190–91. A review of the interviews also shows that the investigators asked open-ended, non-suggestive questions. AD first described DeLeon punching Jordan in the stomach in response to a question asking whether she had ever seen "[a]ny other type of punishment." *Id.* 3189. And, in an effort to avoid any confusion, investigators asked AD to draw where DeLeon struck Jordan.

We also have no trouble concluding that the remaining requirements of Rule 807 are satisfied. AD's statements describing DeLeon striking Jordan in the stomach were material in a case that relied on circumstantial evidence to prove that DeLeon struck the fatal blow. Because AD and Jordan were the only witnesses to the abuse, AD's statements to the investigators were more probative than any other available evidence. Finally, admission of the videotaped statements served the interest of justice and general purposes of the evidentiary rules because it allowed the jury to consider all of the evidence and weigh the credibility of AD's testimony. *See Dunford*, 148 F.3d at 394 (concluding that the interest of justice was served by allowing "the jury to weigh the credibility of all of the evidence and to resolve the serious charges").

Having found that the requirements of Rule 807 are satisfied, we conclude that the district court did not abuse its discretion by admitting AD's videotaped statements under the residual exception to the hearsay rule.

IV.

DeLeon next contends that the district court erred by refusing to allow his expert witness to clarify the standard he applied to determine Jordan's cause of death. Like the other evidentiary issues raised by DeLeon, we review the district

court's ruling for abuse of discretion and will not reverse unless the decision was arbitrary and irrational. *United States v. Iskander*, 407 F.3d 232, 236 (4th Cir. 2005).[4] A trial court has "considerable discretion to determine whether to admit expert testimony," *id.* at 238, and "wide latitude" to limit the scope of examination, *United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996). Finding no abuse of discretion, we affirm the district court's ruling.

Dr. Charles Wetli testified on behalf of DeLeon as an expert in forensic pathology and offered an opinion, consistent with his disclosure to the government, regarding the time and location of Jordan's injury. During his testimony, Wetli agreed to a reasonable degree of medical certainty with the medical examiner's finding that the manner of death was homicide. On redirect, the district court limited Wetli's testimony to verifying the standard applied by forensic pathologists and prevented him from elaborating on the meaning of reasonable degree of medical certainty. Enforcing that ruling, the court then struck Wetli's testimony that medical examiners applied a preponderance of the evidence or fifty-one percent standard when determining manner of death. The court reasoned that questions like these were beyond the scope of the disclosed bases of Wetli's expert opinion. DeLeon contends that the district court's ruling undercut his defense that Jordan's death could have been accidental. We disagree.

The initial thrust of DeLeon's objectionable questions was

---

[4]DeLeon contends that the district court's limitation on his expert's testimony violated his constitutional right to present a complete defense and that we should therefore review his claim de novo. DeLeon's attempt to elevate his claim to the level of a constitutional violation is unpersuasive. In *Iskander*, we reviewed for an abuse of discretion an argument that a trial court's limitation on a defense expert's testimony "gutted" the defendant's case. 407 F.3d at 236 n.2. We apply the same standard here to review DeLeon's identical claim. *See* Appellant's Br. 42 (contending that the district court's limitation "gutted Mr. DeLeon's primary defense that Jordan's death could have been accidental").

to introduce the possibility that the manner of death might have been accidental. These questions called for Wetli to speculate about matters beyond the scope of the expert opinions that he had disclosed to the government. *See United States v. Barile*, 286 F.3d 749, 758–59 (4th Cir. 2002) (affirming the district court's decision to limit an expert's testimony based on the defendant's failure to disclose the opinions prior to trial). Additionally, we agree with the district court that the introduction of percentages or alternative explanations of medical standards might have confused the jury. In any event, we have previously noted that "reasonable degree of medical certainty" is a commonly applied standard in cases involving expert testimony from a medical professional. *E.g.*, *Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982); *see also* 32 C.J.S. *Evidence* § 884 ("[T]here is . . . authority that a medical witness must state his or her opinion in terms of a reasonable degree of medical probability or certainty"). Under the circumstances, there was little need for testimony to illuminate such a commonly applied standard. Thus, we cannot say that the district court abused its discretion by limiting the scope of Wetli's testimony on redirect.

## V.

Next, DeLeon contends that proof of his prior acts of corporal punishment constituted impermissible character evidence. The district court denied DeLeon's motion to exclude evidence of his prior acts under Rule 404(b), holding that the evidence was admissible to prove identity, motive, DeLeon's mental state, and the absence of mistake or accident. Reviewing for abuse of discretion, *United States v. Cabrera-Beltran*, 660 F.3d 742, 755 (4th Cir. 2011), we affirm the district court's ruling.

Rule 404(b) prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence may be admissible, how-

ever, for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "[T]o be admissible under Rule 404(b), evidence must be '(1) relevant to an issue other than character; (2) necessary; and (3) reliable.' " *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008) (quoting *United States v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998)). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271–72 (4th Cir. 2001) (quotation omitted).

In *United States v. Powers*, 59 F.3d 1460, 1463–64 (4th Cir. 1995), we held that evidence of the defendant's violence toward family members was admissible in a child sex abuse case. The defendant was convicted of aggravated sexual abuse of his minor daughter. The district court admitted evidence that the defendant would "whip" his daughter and other children and beat his wife. *Id.* at 1464. Although evidence of the prior acts was of a different character than the crime charged, we affirmed the district court, concluding that the evidence was admissible under Rule 404(b) to explain the victim's behavior and delay in reporting the sexual abuse. *Id.*

Here, the government did not introduce evidence of DeLeon's prior acts of physical punishment for the impermissible purpose of demonstrating bad character. Instead, the contested evidence tended to prove the identity of the perpetrator and rebutted DeLeon's defense that Jordan's death was an accident. Although the prior acts of corporal punishment differed in degree from the blow that killed Jordan, evidence that DeLeon relied heavily on corporal punishment was probative of identity and DeLeon's motive or mental state. Given that the evidence implicates several of the permissible purposes under Rule 404(b), we find no abuse of discretion and affirm.

## VI.

Finally, DeLeon contends that the district court violated his Sixth Amendment rights by imposing a mandatory minimum sentence based on a question of fact not submitted to the jury. After concluding that Jordan was under the age of eighteen, the district court imposed a thirty-year mandatory minimum sentence for DeLeon's second-degree murder conviction pursuant to 18 U.S.C. § 3559(f)(1) and a ten-year mandatory minimum sentence on the assault conviction pursuant to § 3559(f)(3), to run concurrently. DeLeon argues that Jordan's age was an element of the crime that should have been presented to the jury for proof beyond a reasonable doubt rather than a sentencing factor that the court could find by a preponderance of the evidence. Reviewing the district court's conclusion of law de novo, *United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996), we find no error.

Elements of a crime must be proven to a jury beyond a reasonable doubt, while sentencing factors can be proven to the sentencing court by a preponderance of the evidence. *United States v. O'Brien*, 130 S. Ct. 2169, 2174 (2010). Whether a given fact is an element of the crime or a sentencing factor is a question for Congress. *Id.* at 2175. When Congress is not explicit, however, we consider five factors to ascertain its intent: "(1) language and structure, (2) tradition, (3) risk of unfairness, (4) severity of the sentence, and (5) legislative history." *Id.* at 2175 (citing *Castillo v. United States*, 530 U.S. 120, 124–31 (2000)).

In *O'Brien*, the Court considered whether a provision in 18 U.S.C. § 924(c) increasing the mandatory sentence for possession of a firearm in relation to a crime of violence or drug trafficking offense when that firearm was a machinegun is an element of the offense or a sentencing factor. As a threshold matter, the Court concluded that, "as is often the case," Congress had not explicitly resolved the question. *Id.* at 2175. Applying the five factors outlined above, the Court held that

the determination as to whether the firearm was a machinegun was an element of the crime subject to a finding of proof beyond a reasonable doubt by the jury. *Id.* at 2180.

In relevant part, the Court explained that "[s]entencing factors traditionally involve characteristics of the offender—such as recidivism, cooperation with law enforcement, or acceptance of responsibility," while characteristics of the offense, like the weapon used, are traditionally treated as elements. *Id.* The Court also noted the potential for unfairness in cases that involve possession of multiple weapons, one of which qualifies for the enhancement while others do not, where the judge may not know whether the jury based its verdict on the weapon that qualifies for the enhanced sentence. *Id.* at 2177. Finally, the Court concluded that the sixfold increase from five years for carrying a firearm to thirty years if the firearm is a machinegun was not an "incremental change" but instead constituted a "drastic . . . increase that strongly suggests a separate substantive crime." *Id.* at 2177.

In this case, we, too, are confronted with a statute in which Congress has not explicitly voiced its intent. Based on our review of the relevant factors, however, we conclude that under § 3559(f), age is a sentencing factor rather than an element of the crime. *Accord United States v. Brown*, 653 F.3d 656, 660 (8th Cir. 2011) (concluding, under plain error review, that the district court did not err by imposing the § 3559(f) thirty-year mandatory minimum sentence in the absence of a jury finding as to the victim's age).

We begin our inquiry by examining the language and structure of the statute.[5] Section 3559(f) is titled "Sentencing classification of offenses" and appears in a chapter titled "Sentences." Although the title of a provision is not the end of our inquiry, this structure supports our determination that

---

[5]The legislative history of § 3559 sheds little light on our inquiry. Accordingly, we focus on the remaining factors.

age is a sentencing factor, especially when considered in conjunction with the language of § 3559(f). By its terms, § 3559(f) applies to "[a] person who is *convicted*" of one of a series of federal offenses when that offense is committed against a minor. Accordingly, by referring to individuals who have already been convicted of a substantive offense, the language of § 3559(f) indicates that age is not an element of the crime but instead is a factor for consideration at sentencing.

Next, tradition also suggests that age should be treated as a sentencing factor. Admittedly, the age of the victim is more closely related to the characteristics of the offense than the characteristics of the offender. Nevertheless, courts and legislatures have historically treated age as a sentencing factor subject to determination by the court. In *Harris v. United States*, 536 U.S. 545, 567–68 (2002), Justice Kennedy, writing for a plurality of the Court, cited a sentencing provision from Pennsylvania that imposed a mandatory sentence for a crime in which the victim is over sixty years of age. The Court referred to this statute as one that "conditioned [a] mandatory minimum sentence[ ] upon [a] judicial finding[ ]" and explained that its precedents did not overturn or "cast uncertainty" on such statutes. *Id.* Furthermore, the U.S. Sentencing Guidelines provide an enhancement based on a *judicial* determination that the victim of the offense was a "vulnerable victim" due to, among other factors, his or her age. U.S.S.G. § 3A1.1 & n.2. Therefore, while the age of the victim is not a characteristic of the offender, legal tradition posits that age is a sentencing factor, rather than an element of the offense.

Third, the risk of unfairness in treating age as a sentencing factor is minimal. Unlike a case involving multiple weapons where it may be unclear on which weapon the jury's verdict rests, there is little risk of error in determining the age of the victim. To the contrary, although the question of whether a fact constitutes an element or a sentencing factor is a categorical inquiry, a sentencing court generally can easily ascertain

the age of the victim without having to parse the jury's verdict or attempt to guess at the jury's conclusion.

Finally, as the government acknowledges, the severity of the sentence is the only factor that favors treating age as an element of the offense. Here, the age of the victim elevates the mandatory minimum for second-degree murder from zero to thirty years and from zero to ten years for assault. Such an increase is even more drastic than the one the Court confronted in *O'Brien*. Nevertheless, this case is distinguishable from *O'Brien* in that courts traditionally enhance sentences based on judicial determinations of a victim's age and there is a relatively low risk of unfairness in having a judge resolve the issue.

We therefore hold that age under § 3559(f) is not an element of the crime but rather a sentencing factor that the district court in this case could properly determine based on a preponderance of the evidence. Accordingly, we affirm DeLeon's sentence.

## VII.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*