**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 10-2072**

———————

ROBERT J. NAGY,

        Plaintiff - Appellant,

    v.

UNITED STATES OF AMERICA,

        Defendant - Appellee.

———————

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  David C. Norton, District Judge.
(2:08-cv-02555-DCN)

———————

Argued:  December 4, 2012        Decided:  March 29, 2013

———————

Before GREGORY, AGEE, and WYNN, Circuit Judges.

———————

Affirmed in part, reversed in part, and remanded by unpublished
per curiam opinion.

———————

**ARGUED:** John B. Kern, Charleston, South Carolina, for Appellant.
Anthony T. Sheehan, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellee.  **ON BRIEF:** Kathryn Keneally,
Assistant Attorney General, Bridget M. Rowan, Tax Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William
N. Nettles, United States Attorney, Columbia, South Carolina,
for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robert J. Nagy ("Nagy") appeals from the district court's grant of partial summary judgment to the government, certain evidentiary rulings at trial, certain of the jury instructions, and the jury verdict against him imposing civil penalties under § 6700 of the Internal Revenue Code.[1] For the reasons set forth below, we affirm the judgment of the district court in part, reverse in part, vacate the jury verdict, and remand this case for a new trial.

I

Nagy, a certified public accountant, advised Charles Cathcart and his various Derivium companies ("Derivium") in the development and marketing of an investment scheme termed the "90% Loan Program" (the "90% Loans").[2] As part of this scheme, customers of Derivium would transfer appreciated securities to Derivium as "collateral" and receive in return a "loan" equal to 90% of the value of the securities. Derivium represented to its customers that it would cause hedging transactions to be

---

[1] All citations herein are to the Internal Revenue Code of 1986 as codified in volume 26 of the United States Code.

[2] As best we can tell from the record, Nagy was a paid accounting and tax consultant to Derivium and had no ownership or equity interest in it.

2

undertaken so as to protect against market fluctuations the securities given as "collateral." Further, Derivium represented that the 90% Loan payments would be made by a separate offshore entity or entities that would also engage in the hedging transactions. Under the terms of the 90% Loan agreements, Derivium could not demand repayment prior to the maturity date of the "loan," the customer could not repay the principal early, and Derivium would apply any dividends received on the "collateral" securities to repayment of "loan" interest. At maturity of the "loan," the customer had the option to repay the principal and recover the "collateral" securities, to renew the loan, or to forfeit the stock without any further liability on the "loan" even if the remaining principal balance and accrued interest of the "loan" exceeded the value of the forfeited securities.

In reality, upon consummation of a 90% Loan, Derivium would not hold the securities received as collateral, but would immediately sell the customer's securities. Derivium thus funded the 90% Loan payments out of the sales proceeds, while Derivium principals kept the remaining 10% of the sales proceeds, which they used for expenses and their own investments (which failed). There was no separate offshore entity purchasing the "loans" or performing any hedging transactions. Derivium engaged in no

3

hedging transactions on its own and maintained no capital reserves.

By December 2005, Derivium had sold more than $1.25 billion of its customers' securities as part of the 90% Loan scheme. As time passed, many of the Derivium customers' securities increased in value, and the underlying "loans" matured. Customers whose securities had increased in value repaid the "loans" and demanded the return of their securities. As Derivium no longer had the securities or any capital reserves, its entire Ponzi-like scheme eventually collapsed.

Nagy's role in the Derivium saga was to give Derivium his opinion, as a CPA, that the 90% Loans were bona fide loans and not sales of securities, which would have been subject to federal (and state) income tax at the time of the sales. Derivium used Nagy's tax advice in its marketing to customers (it would have had few takers for a taxable transaction) that it offered a tax-free "loan" program. Nagy reviewed and commented on the Derivium marketing materials before their publication to customers with an eye to minimizing any mention of an income tax risk related to the 90% Loans.

The Internal Revenue Service ("IRS") conducted audits of Derivium beginning in late 2001 that concluded with the issuance of no-change letters to Derivium. In 2004, however, both the IRS and California tax authorities began audits of Derivium's 90%

4

Loan customers, eventually determining that the Derivium 90% Loans were sales for income tax purposes and therefore taxable to the customer at the time the securities were transferred. The IRS assessed penalties under I.R.C. § 6700 against Nagy and others who participated in the marketing of the 90% Loans.[3]

Nagy paid 15% of the assessed penalties and filed refund claims pursuant to I.R.C. § 6703(c)(1), which the IRS denied. He then filed the present action in the United States District Court for the District of South Carolina, claiming, among other things, refund of the penalties paid. The government filed a counterclaim against Nagy, asserting Nagy's liability for the unpaid balance of its assessed penalties.

The district court bifurcated the trial into two phases—a liability phase and a penalty amount phase. During the liability phase, the government moved for partial summary judgment on the limited issue of whether the 90% Loans were bona fide loans or sales for tax purposes. The district court granted partial summary judgment in favor of the government, concluding that the 90% Loans were sales for tax purposes.

The case then proceeded to trial by jury. On June 30, 2010, the jury rendered its verdict on liability in favor of the

---

[3] I.R.C. § 6700 authorizes civil penalties against certain persons "[p]romoting abusive tax shelters."

5

government, finding by a preponderance of the evidence that Nagy was subject to the I.R.C. § 6700 penalty. By separate verdict, the jury set the amount of the penalty at $2.636 million.

Nagy timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.


## II

We review a district court's grant of summary judgment de novo. Maracich v. Spears, 675 F.3d 281, 291 (4th Cir. 2012). We review a district court's evidentiary rulings for an abuse of discretion. Creekmore v. Maryview Hosp., 662 F.3d 686, 690 (4th Cir. 2011). We review the adequacy of a district court's jury instructions for an abuse of discretion, while we review the statements of law contained in jury instructions de novo. United States v. Jefferson, 674 F.3d 332, 360 (4th Cir. 2012).


## III

Nagy raises six issues on appeal: (A) whether the district court erred in granting partial summary judgment to the government on the limited issue of whether the 90% Loans were sales for tax purposes and not loans, (B) whether the district court erroneously instructed the jury that Nagy's tax advice to Derivium that the 90% Loans were loans and not sales was a "false or fraudulent" statement as a matter of law for purposes

6

of § 6700, (C) whether the district court abused its discretion in excluding certain evidence submitted by Nagy, (D) whether the district court abused its discretion in admitting certain evidence offered by the government, (E) whether the district court erroneously admitted certain of Nagy's personal tax return information into evidence, and (F) whether the district court erroneously instructed the jury regarding the calculation of the penalty.

A.    Partial Summary Judgment

We first conclude that the district court properly granted summary judgment to the government on the issue of whether the 90% Loans were sales and not loans for tax purposes. The district court correctly applied the doctrine of substance over form and concluded that the 90% Loans were in substance sales for tax purposes because the "benefits and burdens of ownership" had passed from the 90% Loan customers to Derivium. Nagy v. United States, No. 2:08-cv-2555-DCN, 2009 WL 5194996, at *3 (D.S.C. Dec. 22, 2009).[4]

---

[4] As the district court properly found in its partial summary judgment opinion: the 90% Stock Loan Program did not generate genuine indebtedness because:

(a) Derivium had to sell the securities to fund the "loan"; (b) the customer could not repay his "loan" prior to maturity and Derivium could not force a
(Continued)

B.    Liability Phase Jury Instruction

Next, Nagy argues on appeal that the following jury instruction at the liability phase of his trial was erroneous: "In December 2009, this court determined that the 90% Loan transaction was a sale, and not a loan. Thus, statements indicating that the 90% Loan transactions were loans are false." (J.A. 210.) Yet Nagy made no objection to this jury instruction at trial. We conclude that, as Nagy failed to "make timely and sufficient objections" to these jury instructions at trial, he failed to preserve the issue for appeal. See Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 153 n.6 (4th Cir. 2012). Moreover, it is worth noting that the district court twice instructed the jury that it could find Nagy liable under § 6700 regarding the false sale/loan statement only if they found "Nagy knew or had

---

    repayment; (c) the customer was never required to repay the "loan proceeds" he received; (d) the only collateral Derivium ever retained, if any, was 10% of the value of the sale of the securities; (e) the customer retained a contractual return-of-stock right; and (f) because a customer would only repay his "loan" and get his securities back (securities Derivium would have to purchase on the open market) if their value had increased, Derivium would only lose if the customer repaid the "loan," which stands in stark contrast to the ordinary risk assumed by a lender, i.e., not being repaid by the borrower.

Nagy, 2009 WL 5194996, at *3.

reason to know that these statements were false <u>at the time they were made</u>." (J.A. 210 (emphasis added).)

C.    Exclusion of Certain Evidence Submitted by Nagy

Nagy also argues that the district court abused its discretion in sustaining the government's objections to certain evidence he sought to present to the jury. At trial, Nagy attempted to introduce the expert testimony of Mark Altemose, a former IRS tax auditor; a letter written by B. John Williams, a tax attorney; and various internal IRS communications. Nagy argues these items of evidence should have been admitted to disprove that he knew or had reason to know that his tax advice was false. We do not believe the district court abused its discretion in excluding this contested evidence.

Neither the Williams letter nor the internal IRS communications were in existence at the time Nagy gave his tax advice to Derivium so he could not have relied upon it in forming his advice. Therefore neither the Williams letter nor the IRS communications were relevant to show what Nagy knew at the time he gave his tax advice. While Nagy could have offered testimony from Mr. Altemose for a relevant purpose, he chose to offer that expert testimony only regarding the legal import of an IRS no-change letter as well as IRS audit procedures, neither of which have any relevance to show what Nagy knew or should

9

have known at the time he gave his tax advice and would have likely confused the jury. We conclude the district court did not abuse its discretion in excluding the foregoing from consideration as evidence in this case.

D.   Pfleiderer Testimony

Nagy also contends that the district court abused its discretion in admitting into evidence the testimony of Paul Pfleiderer, an expert on behalf of the government, regarding the economic effect of the 90% Loans. To the extent Nagy has presented a challenge to Pfleiderer's testimony, we find it to be meritless, and the district court did not abuse its discretion in admitting Pfleiderer's testimony.

E.   Nagy's Personal Tax Information

At trial, the government sought to put before the jury, as part of its case-in-chief, evidence that Nagy failed to timely file his personal income tax returns in certain years while he was giving the 90% Loan tax advice to Derivium and timely pay the tax due for some of those years. Nagy timely objected to the introduction of that evidence as general bad acts evidence that was not relevant to the § 6700 penalty determination and should be excluded under Rule 404(b) and/or Rule 403 of the Federal Rules of Evidence. The district court overruled Nagy's

objections and permitted the information regarding Nagy's failure to timely file and pay his taxes in certain tax years to come before the jury. Under the circumstances of this case, we conclude that the district court abused its discretion in permitting this evidence before the jury and that its effect was highly prejudicial. We also conclude that the error was not harmless.

Nagy first contends that I.R.C. § 6103(h)(4) did not authorize the disclosure of Nagy's personal income tax return information as evidence in the § 6700 penalty case. While § 6103(h)(4)(A) was clearly satisfied (Nagy was a party to the § 6700 proceeding), the applicability of subsections (B) and (C) is much more problematic. But we will assume, without deciding, that the § 6103(h)(4) restrictions can be applied disjunctively. See Mallas v. United States, 993 F.2d 1111, 1118, 1121–22 (4th Cir. 1993) (applying § 6103(h)(4) disjunctively); see also Rice v. United States, 166 F.3d 1088, 1092 (10th Cir. 1999) (holding that § 6103(h)(4) allows the disclosure of a person's tax return information when that taxpayer "is a party to the proceedings"); Tavery v. United States, 32 F.3d 1423, 1430 (10th Cir. 1994) ("The exceptions in § 6103 are stated in the disjunctive.").

Even if § 6103 does not bar the evidence at issue, however, that conclusion does not resolve the underlying evidentiary issue. The § 6103(h)(4) exceptions operate only as a gatekeeper

11

device that allows the disclosure of taxpayer information in certain situations. If a § 6103(h)(4) exception applies, that determination removes only the statutory disclosure barrier; it does not resolve the independent evidentiary determinations of relevance or prejudice.

Rule 404(b) prohibits the admission of evidence of "a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence may be admissible, however, to show, among other things, "knowledge" and "absence of mistake." Id. 404(b)(2). Evidence is admissible under Rule 404(b) only when that evidence is "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." United States v. DeLeon, 678 F.3d 317, 330 (4th Cir. 2012) (internal quotation marks omitted). Nagy argued to the district court that the evidence of his failure to meet personal tax obligations was not relevant to the determination of liability under § 6700 and served no purpose other than to cast Nagy's character in a negative light. The government argues that the evidence of Nagy's failure to timely file and pay his taxes in certain years during which he was advising Derivium was relevant to show an absence of mistake in his tax advice. Yet the government does not explain, or even

12

attempt to explain, how this evidence was relevant to Nagy's state of mind in the rendering of opinions on the 90% Loans.

The government presented no evidence linking Nagy's failure to file or pay certain personal taxes to his work for Derivium. Nothing in the record connects Nagy's failure to timely file or pay his personal taxes to any knowing act of fraud or fraudulent intent in giving tax advice to Derivium. There simply is no record evidence linking the two. Indeed, Nagy argues that his failure to file or pay his personal taxes was related to severe family medical situations and his lack of assets: acts which would subject Nagy to, at most, negligent failure to file or pay penalties under § 6651.

The government contends that the evidence of Nagy's failure to timely file or pay his personal taxes was relevant to Nagy's state of mind at the time he was rendering tax advice to Derivium. But the government completely fails, as noted above, to make any remote connection between Nagy's failure to timely file and pay his own taxes and his provision of tax advice to Derivium. Nagy was not a Derivium principal or customer, and the record contains no evidence that his personal tax returns depended in any way upon the Derivium scheme.

In short, we are at a loss to see any relevance for Rule 404(b) purposes for the admission of Nagy's personal tax information other than "to prove [Nagy]'s character in order to

13

show that on a particular occasion [Nagy] acted in accordance with the character." See Fed. R. Evid. 404(b). While Rule 404(b) is a rule of evidentiary inclusion, United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006) ("This court has recognized that Rule 404(b) is primarily a rule of inclusion, not exclusion."), any evidence must satisfy the threshold of relevance to an issue other than character that we find lacking here.

Moreover, for Rule 403 purposes, the admission of Nagy's personal tax information was highly prejudicial and quite likely to influence the jury against him. Had the personal tax information had some semblance of relevance (which proper evidence in some other case may well show), a different balancing for prejudice purposes would be required. But in the absence of relevance, we conclude that the district court abused its discretion to admit Nagy's personal tax information into evidence, particularly as it bears all the indicia of garden-variety "bad acts" evidence with no other purpose than to emotionally inflame the jury against the defendant.

Further, we conclude that the admission of Nagy's personal tax information was not a harmless error. Under harmless error analysis, we will not reverse if we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States,

14

328 U.S. 750, 765 (1946). Nagy presented a cognizable defense as to his state of mind for the knowledge purposes of § 6700 that would have permitted a reasonable jury to have rendered a verdict in his favor. The prejudicial effect on the jury of the personal tax information about Nagy, however, and the possibility that it swayed their judgment in their consideration of this case, cannot be ignored. As the error was not harmless, the liability verdict must be vacated.

F.    Penalty Amount Phase Jury Instruction

Reversal of the liability verdict also invalidates the penalty determination in so much as there is no longer a liability finding upon which it could be based. However, in view of the likelihood, that a penalty calculation issue will arise again upon remand, we exercise our discretion to address an assignment of error that Nagy raises. See United States ex. rel. Drakeford v. Tuomey Healthcare Sys., Inc., 675 F.3d 394, 406 (4th Cir. 2012) (noting that "our precedent is clear that we may address issues that are likely to recur on remand").

Nagy contends that the district court erred in its jury instruction for the calculation of the § 6700 penalty amount for any § 6700 liability prior to October 23, 2004, the date of an amendment to the statute, by instructing the jury to "multiply the total number of transactions for which [Nagy] is liable for

15

each year by $1000" for all transactions occurring before October 23, 2004. (J.A. 217–18.) The statute plainly states that, with respect to transactions occurring before October 23, 2004, any person who violates § 6700 "shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity." I.R.C. § 6700(a). Any jury instruction given in a penalty amount determination trial upon remand should follow the plain language of the applicable portion of the statute.

IV

For the aforementioned reasons, we affirm the district court's grant of partial summary judgment to the government on the issue of whether the 90% Loans were sales for federal income tax purposes. We also affirm the district court's giving of the jury instruction relating to whether a statement that the 90% Loans were not sales for tax purposes would be a false or fraudulent statement for § 6700 purposes. Further, we hold that the district court did not abuse its discretion in excluding the evidence from Altemose and Williams and the internal IRS communications. Neither did the district court abuse its discretion in admitting the evidence of Mr. Pfleiderer.

16

The district court did abuse its discretion, however, in admitting Nagy's personal tax information and the liability and penalty verdicts are therefore vacated. The case is hereby remanded to the district court for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>